In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-3749

MARVIN BIEGHLER,

*Petitioner-Appellant,*

*v.*

DANIEL McBRIDE, Superintendent,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 98 C 490—**Larry J. McKinney**, *Chief Judge.*

ARGUED AUGUST 25, 2004—DECIDED NOVEMBER 18, 2004

Before KANNE, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Twenty-three years ago, Kenny Miller went to visit his 21-year-old brother, Tommy, who lived with his pregnant 19-year-old wife, Kimberly, in a trailer near Kokomo, Indiana. When he arrived, he discovered a gruesome scene: Tommy and Kimberly had been shot to death, Tommy with six bullets and Kimberly with three. Marvin Bieghler was eventually tried, convicted, and sentenced to death for the two murders in 1983. His convictions and death sentence were upheld by the Indiana Supreme Court, both on direct appeal 2 years later, *Bieghler v. Indiana*, 481 N.E.2d 78 (Ind. 1985), and 12 years after that on appeal from the denial of a petition for postconviction relief, *Bieghler v. Indiana*, 690 N.E.2d 188

(Ind. 1997). Bieghler moved to federal court in 1998 and is here today appealing the district court's denial of his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254.

First, the senseless facts as determined by the state courts, which we accept as true on this collateral review. Bieghler was a major drug supplier in Kokomo. He obtained his drugs in Florida and had others, including Tommy Miller, distribute them in the Kokomo area. Several witnesses, including a Bieghler bodyguard named Harold "Scotty" Brook, testified that prior to the murders, someone within Bieghler's drug-dealing operation gave information to the police which led to the arrest of a distributor and the confiscation of some dope. An incensed Bieghler declared repeatedly that when he found out who blew the whistle, he would "blow away" the informant. Eventually, Bieghler began to suspect that Tommy Miller was the snitch: he told associates that he was going to get him.

A major portion of the State's case rested on the testimony of Brook, who was not prosecuted for his role in the events. According to that testimony, Bieghler and Brook spent the day of the murders drinking beer and getting high on marijuana. During the evening, Bieghler spoke of getting Tommy Miller. Around 10:30 or 11:00 p.m. they left a tavern and drove to Tommy's trailer. Bieghler got out of the car and went inside carrying an automatic pistol. Brook followed and saw Bieghler pointing the weapon into a room. Bieghler and Brook then ran back to the car and drove away. Later that night, a distraught Bieghler tearfully announced that he was leaving for Florida. Tommy's and Kimberly's bullet-ridden bodies were discovered the next morning. Police learned that nine shell casings found at the murder scene matched casings from a remote rural location where Bieghler fired his pistol during target practice. At trial, an expert testified that the two sets of casings were fired from the same gun.

Bieghler contends that the prosecution violated his due process rights by exploiting, at trial, his failure to talk to the police after his arrest. He also claims that he was denied effective assistance of counsel. Because Bieghler's petition was filed after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs our analysis. Under the AEDPA, a federal court may not grant a writ unless a final state court decision in the case was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). A state court decision is "contrary to" established Supreme Court precedent when the state court reaches a legal conclusion opposite to that of the Court or decides a case differently than the Court despite "materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An "unreasonable application" of Supreme Court precedent occurs when the state court identified the correct rule of law but applied it unreasonably to the facts. *Id.*

According to Bieghler, the prosecution, during its cross-examination of him and again during closing argument, exploited the fact that, after being advised of his *Miranda* rights, he elected to remain silent and not give arresting officers the version of the night's events he related on the witness stand. If so, this was a constitutionally impermissible tactic under *Doyle v. Ohio*, 426 U.S. 610 (1976). As applicable here, *Doyle* holds that the prosecution violates a defendant's due process rights when it uses post-arrest silence to impeach an exculpatory story told at trial. *See United States v. Shue*, 766 F.2d 1122 (7th Cir. 1985). This is so because it is fundamentally unfair to assure a defendant, with *Miranda* warnings, that his silence will not be used against him, and then turn around and do exactly that.

Bieghler cites several references by the prosecutor to his post-arrest, post-*Miranda*-warning silence. His trial counsel, however, did not object to these references and therefore forfeited subsequent challenges to them. *E.g.*, *United States v. Jacques*, 345 F.3d 960, 962 (7th Cir. 2003). Ordinarily, when a claimed error is forfeited, we only analyze whether the trial court plainly erred by allowing the prosecutor's comments. *Id.* But here we evaluate Bieghler's claim "without the screen of the plain error standard" because the State has not argued that it applies. *United States v. Cotnam*, 88 F.3d 487, 498 n.12 (7th Cir. 1996) (internal quotations omitted); *United States v. Leichtnam*, 948 F.2d 370, 375 (7th Cir. 1991).

At trial, Bieghler took the stand and denied complicity in the murders. He testified about being at other places with other people when the Millers were killed. On this appeal, he complains about several questions put to him by the state's attorney during cross-examination. The prosecutor asked: "[P]rior to the beginning of this trial, did you ever tell the story that you've told today to anyone besides your attorneys?", "Were you ever given any opportunity to tell the story to anyone?", and "Did you give it?" In response to the last question, Bieghler answered, "No, I exercised my *Miranda* rights." The prosecutor then asked three questions concerning Bieghler's understanding of his *Miranda* rights before moving on to another subject. It is the State's contention that no reference was made to Bieghler's silence. He was merely fairly cross-examined, says the State, about his direct testimony for the purpose of testing his credibility as a witness.

In an argument that's a little hard to follow, Bieghler contends that this snippet from the prosecutor's closing remarks to the jury ran afoul of the rule announced in *Doyle*:

> Kenny Cockrell's the one that took the Fifth. Kenny Cockrell's the one that wouldn't answer when I asked if

he was doing something to Bobby Nutt because a deal went bad. He took the Fifth. Didn't want to be discriminated against. I'm growing to hate that train. As a matter of fact, that train came by during my examination of the Defendant. I don't know, maybe it was my imagination, maybe I wanted to see it, but did you see him, about right before the train came by started to get, his voice was a little different about the time when he left Dusty's? You can talk about that. Maybe I only saw it because I wanted to.

A little later, Bieghler sees error in this statement from the prosecutor's closing argument:

The Defendant denies that he was there. And even though it's not testimony, looking through it in the opening statement, [Defense Counsel] Mr. Scruggs said that he, the Defendant went there that night to Bobby Nutt's. Now the only person that's important to me is, I was looking, I was listening, waiting to hear so that I would know what the Defendant was going to say. You know, I didn't hear him until he sat up here, and you heard him just like I did. He had everything I had but I could never talk to him. I couldn't use prior inconsistent statements to impeach him because I didn't have any. He never said anything . . . .

The State contends that the prosecutor's statements in closing argument were meant to show that Bieghler had an opportunity to hear the State's evidence, and make an assessment of it, before he elected to take the stand and give his testimony. It was fair game, the State says, to argue that it gathered and presented its evidence without knowing what Bieghler's version of the events would be until he revealed it during the trial.

We do not believe that the questions and closing argument comments ran afoul of *Doyle*. In none did the prosecu-

tor equate Bieghler's silence with guilt, the evil condemned in *Doyle* as undermining the privilege against self-incrimination. The prosecutor, in closing argument, did say that Bieghler "never said anything . . .", which runs close to the *Doyle* line, but we don't think he crossed it, and we emphasize there was no explicit invitation for the jury to infer guilt from Bieghler's decision to stay quiet after he was arrested; at best, any reference was very indirect.

Indeed, the prosecution's conduct in this case was a far cry from what transpired in *Doyle*, which featured repeated and blatant exploitation of the defendants' post-arrest silence. In that case, Jefferson Doyle and Richard Wood were arrested together and charged with selling marijuana to an informant named William Bonnell. Bonnell had arranged to buy 10 pounds from the defendants for $1,750, but narcotics agents could only muster $1,320. Under the watchful eye of four agents, Bonnell met Doyle and Wood in a parking lot and completed the transaction. Minutes later, the two discovered that they had been shorted and began circling the neighborhood looking for Bonnell. Agent Kenneth Beamer promptly arrived at the scene, arrested Doyle and Wood, and gave them *Miranda* warnings. Police then found $1,320 in the car.

Both defendants said for the first time at trial that Bonnell had framed them and that they were buyers, not sellers. Each testified that they originally agreed to buy 10 pounds of marijuana from Bonnell but decided at the last minute to buy a lesser amount. When they informed Bonnell of the change of heart, Bonnell grew angry, threw $1,320 into their car, and left the parking lot with the 10 pounds of marijuana in hand. Perplexed, Doyle and Wood went looking for Bonnell to find out why he had thrown the money into the car. During cross-examination, the prosecution asked them why they had not told the frame-up story right away to Agent Beamer. The prosecution asked questions like "I assume you told [Beamer] all

about what happened to you?"; "[i]f that is all you had to do with this and you are innocent, when Mr. Beamer arrived at the scene why didn't you tell him?"; "[b]ut in any event you didn't bother to tell Mr. Beamer anything about this?"; "[t]hat's why you told the police department and Kenneth Beamer when they arrived . . . about your innocence?"; "[y]ou said nothing at all about how you had been set up?"; and "[b]ut you didn't protest your innocence at that time?" The Court concluded that these questions were attempts to use the defendants' silence against them, which deprived them of due process in violation of the Fourteenth Amendment. Unlike the questions asked in *Doyle*, the prosecution here did not use Bieghler's silence against him.

The prosecution's questions and statements in this case were also far less egregious than those in other cases where *Doyle* violations were found to have occurred. For instance, in *Lieberman v. Washington*, 128 F.3d 1085 (7th Cir. 1997), a defendant charged with rape testified for the first time at trial that he was with his mother when the crime was committed. He also testified that he was "severely questioned" by police the night he was arrested. During cross-examination and closing argument, the prosecution attacked the veracity of his testimony by pointing out that he had not made his alibi known at the time of his arrest. Most troubling was its argument that "[y]ou heard [the state's attorney] ask him questions, did you tell the police you were with your mother on December the 17th, 1979? No. That's where he says he was today, ladies and gentlemen. Did he tell the police when he was severely questioned, according to him? Absolutely not, absolutely not."

Similarly, in *Feela v. Israel*, 727 F.2d 151 (7th Cir. 1984), the prosecution emphasized in cross-examination and closing argument that the defendant, Douglas Feela, had presented an unusual alibi for the first time on the witness stand. Feela, on trial for the armed robbery of a liquor store, testified that at the time of the crime he

was walking into a town when an armed assailant stuck a gun into his back, handed him "something," and ordered him to run. Feela then heard a gunshot and saw snow fly up near him, so he ducked into a basement, only to discover that the "something" now in his possession were the vest, gun, and gloves that had been used in the robbery. Police later discovered Feela in the basement with these materials. The prosecution asked Feela repeatedly whether he had given this account at the time of arrest and then emphasized his post-arrest silence during closing argument: "We are not told . . . that I [Feela] have got no reason to fear that because a mysterious man put this stuff in my arms, and I was forced to carry it over there. We never heard that until today."

Nor is this case anything like *United States ex rel. Allen v. Franzen*, 659 F.2d 745 (7th Cir. 1981). In that case, the prosecution repeatedly questioned whether the defendant, Eddie Allen, told investigators that he killed his wife in self-defense, a story he told from the witness stand. And during closing argument, the prosecution hammered home the fact that Allen had not mentioned to investigators that he acted in self-defense:

> Now, when by the way, did the defendant first say self-defense? Did he say this to officer Terry Melloy, I just shot my wife, I had to do it, she came at me with a knife in the kitchen! Did he say that? Did he say, she was going into her purse, I thought she had a gun, I had to shoot her! Or did he even say, I shot my wife in self-defense. No, none of these.

> * * * *

> After he shot his wife five times and stood over her and sent the hammer home on an empty cylinder, did he then say, oh my God, I had to do it. I thought she was going for a gun. No, what he said was, she's dead now. The defendant could not say self-defense

> because there was no self-defense. The defendant is a cold blooded, brutal murderer.

The prosecutor's comments and questions in our case were nothing like this diatribe.[1]

In contrast to *Doyle* and these other cases, the prosecution here did not argue that Bieghler's initial silence undermined the reliability of his trial testimony nor at any point did it use his silence as evidence of guilt. As we explained in *Splunge v. Parke*, 160 F.3d 369 (7th Cir. 1998), "what *Doyle* stands for is that arrest-time silence not be used to impeach trial-time testimony by asking something like: 'If the version of events to which you have just testified is true, why didn't you tell this to the police as soon as you were arrested?" Like in *Splunge*, the prosecution's questions and argument regarding Bieghler's post-arrest conduct were not aimed at impeaching Bieghler's trial testimony.[2]

---

[1] Our case is also less egregious than those in which alleged *Doyle* violations occurred after the defendant opened the door to government questioning by commenting on his own post-arrest behavior. In these cases, the prosecution went beyond impeaching the defendant's testimony regarding his post-arrest conduct, which is proper, and instead argued that the defendant's silence was inconsistent with his claim of innocence. *See United States v. Gant*, 17 F.3d 935, 943 (7th Cir. 1994) (government argued that defendant's silence was consistent with behavior of confederate to crime); *United States v. Shue*, 766 F.2d 1122, 1128-29 (7th Cir. 1985) (government argued that defendant "refused to talk to the FBI, refused. And no one ever heard of this preposterous, incredible story of a frame until he hit the witness stand.").

[2] Bieghler also cites a comment by the prosecutor that the motive for remaining silent is to avoid being incriminated. But this comment was made in the context of discussing the testimony of another witness, not Bieghler. *See Hough v. Anderson*, 272 F.3d

(continued...)

Moreover, even if we were moved to conclude that a *Doyle* violation occurred, we would have to find that it was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Bieghler cannot demonstrate that the prosecutor's questions and comments undermined the integrity of the jury's guilty findings in light of the substantial evidence of his guilt. This evidence included Brook's damning testimony, the matching shell casings, testimony that Bieghler had threatened to kill Tommy, and testimony regarding Bieghler's distraught and panicked behavior after the slayings. As we see it, the questions and statements that are challenged here were but a mere blip in a lengthy trial, comprising roughly 2 pages of a 3353-page transcript. *See Lieberman*, 128 F.3d at 1096 (concluding that limited references during a lengthy trial were harmless); *United States v. Scott*, 47 F.3d 904, 907 (7th Cir. 1995) (remark comprising one paragraph in 10-page closing argument deemed harmless). Bieghler complains that any *Doyle* error here was prejudicial because the government's case rested on the testimony of Brook, an unsavory and shady character. But the jury obviously accepted Brook's testimony, warts and all, and it is not our place to second-guess that assessment.

Bieghler's remaining arguments center on the performances of his lawyers. He claims that he was denied the effective assistance of counsel because his lawyers failed to: (1) object to evidence of his past drug usage; (2) present mitigating evidence during the penalty phase of his trial; and (3) present alibi evidence. To establish a claim of

---

[2] (...continued)
878, 902 (7th Cir. 2001) (reference to *defendant's* silence is necessary to demonstrate *Doyle* violation); *United States v. Ramos*, 932 F.2d 611, 616 (7th Cir. 1991) (same).

ineffective assistance of counsel, Bieghler has to show two things. First, he must demonstrate that his lawyers performed deficiently, i.e., that their mistakes were so serious that they deprived him of "counsel" within the meaning of the Sixth Amendment. Second, he must show prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, Bieghler must show that there is a reasonable probability that the result of the trial would have been different absent counsels' shortcomings. Bieghler must also surmount the strong presumption that his counsel performed adequately.

The Indiana Supreme Court's rejection of Bieghler's claims of ineffective assistance of counsel under *Strickland* was eminently reasonable.[3] Although Bieghler's lawyers did not object to evidence of his past drug use, they held back for strategic reasons. One of Bieghler's lawyers testified that they decided to pursue a strategy of "candor and sincerity" in order to bolster Bieghler's credibility in the eyes of the jury, a reasonable tactical decision that courts will not second-guess. *See id.* at 689; *Valenzuela v. United States*, 261 F.3d 694, 698 (7th Cir. 2001). The remaining errors advanced by Bieghler were also reasonably rejected as bases for a viable Sixth Amendment claim. Citing *Wiggins v. Smith*, 539 U.S. 510 (2003), he complains that counsel failed to conduct a reasonable investigation into: (1) mitigating evidence of his good character and of post-traumatic stress disorder from his service in Vietnam; and (2) finding a potential alibi witness. But counsel did present witness testimony regarding Bieghler's good character, as well as the violent nature of his service in Vietnam and how that affected his personality upon his return. Bieghler fails

---

[3] Bieghler contends that the Indiana Supreme Court applied the wrong legal standard in evaluating his claims, but that is folly. Indeed, the language cited by Bieghler from the state court's adjudication comes directly from *Strickland*.

to demonstrate that additional mitigating evidence would have made any difference, let alone that counsels' investigation into these matters fell below objective standards of professional conduct. *See Conner v. McBride*, 375 F.3d 643, 662-63 (7th Cir. 2004). The same is true regarding counsels' failure to uncover a potential alibi witness. Bieghler acknowledges that counsel thoroughly reviewed the police and FBI reports, interviewed several witnesses, and pursued an independent investigation into witnesses from Tennessee who might have aided his defense. He also admits that the potential alibi witness did not come forward before or during trial and that she was discovered by chance later on. Under these circumstances, counsels' failure to find the alibi witness was understandable and not a product of a constitutionally deficient investigation.

For all these reasons, the judgment of the district court denying Bieghler's petition for a writ of habeas corpus is AFFIRMED.

No. 03-3749                                                                                        13

A true Copy:

     Teste:

 

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*