# United States Court of Appeals
## For the First Circuit

Nos. 06-1659, 07-2515

UNITED STATES OF AMERICA,

Plaintiff,

v.

LUIS DE LA CRUZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, Senior U.S. District Judge]
[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Senior Circuit Judge
and Stafford,* Senior District Judge.

Paul J. Haley, with whom Law Office of Paul J. Haley was on brief, for appellant.
Jeffrey P. Singdahlsen, Attorney, U.S. Department of Justice Criminal Division, Appellate Section, with whom Michael J. Sullivan, United States Attorney, and Rachel E. Hershfang, Assistant United States Attorney, were on brief, for the United States.

February 1, 2008

* Of the Northern District of Florida, sitting by designation.

**Stafford**, **Senior District Judge**.  Luis De La Cruz ("Defendant") appeals from the district court's final judgment of conviction entered on a jury verdict of "guilty" as to two offenses: (1) conspiracy to distribute and to possess with the intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count One); and (2) possession with the intent to distribute and distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) (Count Two).  Defendant also appeals the district court's denial of his motion for new trial.  We affirm.

I.

For a number of years, beginning at least in 1999 and continuing until his arrest in 2001, Defendant—also known as Carlos—was the leader of an organization that distributed heroin in and around Lawrence, Massachusetts.  From his suppliers, Defendant received heroin that was compressed into pellets approximately the size of a thumb.  Called fingers, the pellets each contained eight to twelve grams of heroin.  With the help of his runners, Defendant processed the bulk heroin and placed the resulting powder into small baggies.  Ten baggies were then grouped together—each group of ten constituting a bundle—and placed in a plastic sandwich bag for distribution.

Customers would typically call Defendant on his cell phone to arrange a buy.  Defendant, or one of his runners, would later meet the customer at a specified public place, then move to

a more private place to complete the sale. On March 8, 2001, one of Defendant's regular customers, Alison Tracy ("Tracy"), called Defendant to arrange the purchase of 25 bundles of heroin. While Tracy intended to use some of the heroin herself, she also intended to sell eight of the bundles to one of her customers, Jesse Flynn ("Flynn").

As they had on prior occasions, Tracy and Flynn drove to Lawrence to pick up the heroin. Upon arriving in Lawrence, using Flynn's cell phone, Tracy called Defendant to get directions for meeting. Defendant told Tracy to wait at a local Dunkin Donuts store. From the donut store, Defendant led Tracy and Flynn to a quiet street where he sold Tracy 25 bundles (250 baggies) of heroin. Some of these bundles contained baggies marked with black eagles; the remainder of the bundles contained baggies marked with blue stars.

On that same March 8th day, Tracy also bought 25 bundles of heroin from Richard Frias, whose street name was Miguel. The baggies in the bundles that she purchased from Miguel were marked with red beetles and blue dolphins. From the total bundles that she bought that day, Tracy sold Flynn eight bundles: four bundles—marked with blue stars and black eagles—that came from Defendant, and four bundles—marked with blue dolphins—that came from Miguel.

On March 9, 2001, Bryan Wallace ("Wallace"), one of

-3-

Flynn's childhood friends, asked Flynn for some heroin. Flynn initially refused to sell to Wallace but soon after relented, agreeing to meet Wallace that evening at a restaurant in New Hampshire. After eating dinner, Flynn sold Wallace two bundles of heroin, one bundle containing baggies marked with blue stars and one bundle containing baggies marked with black eagles.

Wallace's girlfriend, Shay Kelleher ("Kelleher"), stopped at Wallace's home to visit later that night. Kelleher found Wallace looking pale and sluggish, with red eyes and constricted pupils. Although Wallace appeared "unmistakably different" to Kelleher, he did not appear to be in danger. She had previously seen him high on various drugs, and he had never before suffered any adverse consequences from his drug usage. Wallace showed Kelleher some baggies that he said contained heroin bought from a friend. Kelleher described the baggies as being marked with small birds resembling the Harley-Davidson black eagle logo.

The next evening, when Kelleher again stopped by Wallace's home, she found Wallace's dead body. Blood had pooled in his legs, and a blood-tinged foam cone had formed over his mouth. When the police arrived, they found eleven torn and empty baggies—some marked with black eagles and some with blue stars—inside a garbage can, and seven unopened baggies—marked with blue stars—on the kitchenette counter. The baggies tested positive for heroin, as did the drug paraphernalia that was found in

-4-

Wallace's room.

On the evening that Wallace's body was found, Wallace's mother told investigators that her son had received a telephone call from his friend, Jesse Flynn, the previous afternoon. Arrested on March 20, 2001, Flynn told investigators that he bought heroin on March 8 from Tracy and that he sold some of that heroin to Wallace on March 9.

On March 21, based on the information provided by Flynn, investigators interviewed Tracy, who was then in custody on a parole violation. Admitting that she sold heroin to Flynn, Tracy agreed to place controlled calls to her suppliers, Carlos and Miguel. Tracy's cooperation led investigators the next day, March 22, to (1) interview and then arrest Defendant, or Carlos; and (2) arrest Roberto Herrera ("Herrera"), one of Miguel's runners, as he was attempting to deliver heroin to Tracy. When arrested, Herrera had in his possession ten bundles of heroin, some marked with black eagles and some with blue stars, the same markings that appeared on the baggies sold by Defendant to Tracy on March 8.

Defendant was initially charged—by indictment dated April 4, 2001—with one count of conspiracy to possess with the intent to distribute heroin, in violation of 21 U.S.C. § 846. There was no allegation in the initial indictment that the conspiracy resulted in the death of Bryan Wallace.

A three-count superseding indictment was returned on

October 24, 2002. Count One again alleged a section 846 conspiracy. In Counts Two and Three, it was alleged that, on or about March 8 and March 9, 2001, respectively, Defendant possessed with the intent to distribute, and did distribute, a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841, or aided and abetted the same in violation of 18 U.S.C. § 2. In all three counts, it was alleged that the offense resulted in the death of Bryan Wallace.

A second superseding indictment was returned on December 8, 2004. The second superseding indictment contained two counts: a section 846 conspiracy count and a section 841 substantive offense count. In both counts, it was alleged that the offense resulted in the death of Bryan Wallace. In addition, notice was given of three additional factors: (1) that Defendant was accountable for at least 1 kilogram, but not more than 3 kilograms, of heroin; (2) that Defendant was a manager and supervisor of a criminal activity that involved at least five participants; and (3) that death and serious bodily injury resulted from the use of the heroin distributed by Defendant.

On January 5, 2005, Defendant filed an emergency motion to go to trial on the first superseding indictment. The emergency motion was filed the day he was to be arraigned on the second superseding indictment, which was just four days before trial on the first superseding indictment was scheduled to begin. Defendant

-6-

argued that he should be permitted to go to trial on the first, rather than the second, superseding indictment because he was then ready to go to trial on the first superseding indictment and because he would be "severely prejudiced" by the government's delay in adding the "expansive charges" contained in the second superseding indictment. While he noted in his motion that he had been detained for close to four years without a trial, Defendant did not expressly move to dismiss the second superseding indictment on speedy trial grounds. Indeed, he made no mention whatsoever of the Speedy Trial Act in his motion. To the contrary, Defendant made it clear that he was not then moving to dismiss the second superseding indictment, expressly stating that he "reserved[d] his right to bring a motion to dismiss the second Superseding Indictment."

The district court denied Defendant's emergency motion, stating: "Denied for failure to show that it is an appropriate order for this court to make that asserted facts alleged in the Second Superseding indictment should be disregarded in the fair disposition of this case." Defendant did not thereafter file a motion to dismiss the second superseding indictment on speedy trial grounds.

A two-week jury trial began on April 25, 2005. The jury found Defendant guilty of the two offenses, or counts, charged in the second superseding indictment. As to the conspiracy count, the

jury found, beyond a reasonable doubt, that the conspiracy involved 1 kilogram or more of a mixture or substance containing a detectable amount of heroin, that the ingestion of heroin was a but-for cause of Bryan Wallace's death, that the heroin causing Wallace's death was distributed as part of the charged conspiracy, and that Defendant himself was in the chain of distribution for the heroin causing Wallace's death. As to the substantive count, the jury found, beyond a reasonable doubt, that ingestion of heroin was a but-for cause of Wallace's death, and that the heroin causing Wallace's death passed through Defendant's hands.

On May 12, 2005, the day he was convicted, Defendant filed a two-sentence motion for new trial, requesting—in his motion—additional time to file a memorandum of points and authorities in support of the motion. The district court granted Defendant's oral request that a hearing on his motion for new trial be held "at a later time" but did not set a specific time for that hearing or otherwise address Defendant's motion for new trial.

On February 14, 2006, the district court sentenced Defendant to twenty years in prison, with five years of supervised release to follow. Twenty years is the mandatory minimum sentence required under 21 U.S.C. § 841(b)(1)(A) where a death results. Defendant filed his first notice of appeal on March 10, 2006, raising seven issues. Four months later, Defendant filed (in the district court) a memorandum of law in support of his motion for a

new trial, raising eight grounds for relief—the seven claims raised in his appeal plus a claim that the verdicts were against the weight of the evidence.

After Defendant's appeal was fully briefed and argued, this court—whilst retaining appellate jurisdiction—ordered a limited remand to permit the district court[1] to consider Defendant's motion for new trial, a motion that "by mischance" had never been resolved.  The district court ordered further briefing and held a hearing on the motion on June 27, 2007.  By order entered August 20, 2007, the district court denied Defendant's motion for new trial, finding no merit to any of Defendant's eight grounds for relief.  The case was thereafter returned to this court for supplemental briefing and resolution.

In his supplemental brief on appeal, Defendant argued—for the first time on appeal—that the verdicts were against the weight of the evidence.  He also added argument regarding one of the seven issues raised in his initial brief on appeal.  He otherwise relied on the arguments raised in his initial brief.

Defendant also filed a separate appeal from the district court's denial of his motion for new trial.  That appeal—docketed as No. 07-2515—was consolidated with Defendant's initial appeal,

---

[1]    Senior United States District Judge Robert E. Keeton presided over the trial.  Due to Judge Keeton's retirement, United States District Judge Joseph L. Tauro presided over the case on remand.

No. 06-1659. Although a briefing schedule was established in the second appeal, Defendant advised the court that he did not intend to file an opening brief in that appeal but would, instead, rely on the briefs filed in his first appeal. When the government advised the court that it likewise would rely on the briefs filed in the first appeal, appeal No. 07-2515 was submitted to the court for resolution. The two appeals are now ripe for resolution.

## II.

Defendant raises eight issues on appeal, all of which lack merit.

## A.

Defendant first claims that his speedy trial rights were violated when the district court permitted the government to proceed to trial on the second superseding indictment. On remand, the district court rejected this claim, finding that Defendant waived his speedy trial claim when he failed to move for dismissal of the second superseding indictment on speedy trial grounds prior to trial.

The Speedy Trial Act, 18 U.S.C. § 3162(a)(2), specifically provides that "[f]ailure of the defendant to move for dismissal prior to trial . . . shall constitute a waiver of the right to dismissal under this section." See United States v. Gomez, 67 F.3d 1515, 1520 (1st Cir. 1995) (explaining that "just as the [Speedy Trial] Act provides a remedy for violation of its

speedy trial mandate, so too it unequivocally provides that the failure of a defendant to move for dismissal prior to trial constitutes a waiver of any right to that remedy").

Here, the record clearly reveals that Defendant did not move to dismiss the second superseding indictment prior to trial. While Defendant complained about the government's delay in filing the second superseding indictment, he did so in an emergency motion to go to trial on the first superseding indictment, not in a motion to dismiss the second superseding indictment. In that emergency motion, Defendant expressly reserved his right to file—*in the future*—a motion to dismiss the second superseding indictment. After his emergency motion was denied, however, Defendant failed to exercise the right that he expressly reserved, namely, the right to file a motion to dismiss the second superseding indictment. As a consequence, he cannot now obtain relief on speedy trial grounds.

B.

Defendant next contends that the district court abused its discretion when it permitted the government's chemist, Stacy Turner ("Turner"), to testify about the purity of the heroin found in Wallace's home the night his body was discovered. Defendant maintains, and the government concedes, that Defendant was not specifically informed prior to trial that Turner would so testify. Instead, Defendant was informed generally that Turner would testify about the tests she performed and the conclusions she drew with

-11-

regard to the drugs and drug residue analyzed in the case.[2]

Finding no merit to this claim, the district court on remand explained that Defendant did not and could not demonstrate that he suffered actual prejudice from the inadequate disclosure, mostly because the challenged testimony was cumulative and because there was ample evidence, without Turner's testimony, that firmly connected Defendant to the death of Wallace. We agree.

On direct examination by the government, soon after Turner testified that the heroin seized from Herrara on March 22 tested thirty-seven percent pure, Turner was asked about the purity of the heroin found in Wallace's room on March 10:

> Q: And based on the smallness of the sample of the heroin and your ability to extract it directly, what, if anything, did you conclude about its purity?
>
> A: It's of a higher purity.
>
> Q: And why do you say that? How are you able to say that?
>
> A: Well, this exhibit, looking at it under the microscope, first of all, when I do the microcrystal test, when you put acid on it, if the substance completely dissolves into it, you can likely say that there's no cut present because most things won't dissolve, most cuts won't dissolve. Then when looking at the crystals, the heroin crystals that form, they're very clear. If there was something else present, there would be distorted

---

[2] While the government's pre-trial disclosure included laboratory reports that identified the tests that were run and their results, those reports did not include Turner's conclusions about the purity of the heroin found in Wallace's home.

> crystals there.  And also, with the IR itself,
> a direct sample with nothing else in it
> indicates a higher purity substance.
>
> Q:   And when you say a higher purity substance,
>      what do you mean?
>
> A:   In my experience, it tends to be 80 percent or
>      higher.

At this point in Turner's testimony, Defendant objected and moved to strike.  The district court overruled the objection and denied the motion to strike without discussion.

Following cross and redirect examination of Turner, Defendant renewed his objection and motion to strike.  Explaining his objection to the court at side bar, Defendant stated that he expected the government to use Turner's testimony to argue that the heroin seized from Wallace's home was different from the heroin seized from Herrara.  The government indicated that it would make no such argument.  The district court again overruled the objection and denied the motion to strike, suggesting that it would be better not to emphasize the testimony by again bringing it to the jury's attention.

Defendant then said to the court: "I'm just thinking whether or not I should ask for a continuance on this particular matter. . . . May I preserve my right to recall her?"  The district court responded that it would not grant Defendant a blanket right to recall Turner but would hear from the parties if Defendant should, in fact, decide to recall her.

With the jury in recess and the government having rested, the district court sua sponte returned to the issue of a continuance. "I think you asked for a continuance. I think I've indicated that I would not allow that. Of course, if you want to bring it up again, you may do so." Id. at 94. Defendant responded: "I may want to confer with a forensic toxicologist that's been working with me about that purity matter . . . and I would just ask for the afternoon so I could go back to my office and call [the toxicologist]." Id. at 94-95. Denying Defendant's request for an afternoon's break, the court instead recessed for an hour-and-twenty-minute lunch break.

At the conclusion of the break, Defendant moved for a mistrial based on the government's failure to disclose that Turner would be testifying about the purity of the heroin found with Wallace. He argued that Turner's purity testimony had "ship-wrecked" his defense. He explained that his theory of defense was based on the similarities in the baggie markings used by Defendant and Miguel. He maintained that because Defendant and Miguel both—at times—distributed baggies marked with blue stars and black eagles, the jury could have concluded that Miguel, and not Defendant, supplied the heroin on which Wallace overdosed. Defendant did not ask to recall Turner; he did not ask for more time to consult his toxicologist; and he did not explain how his defense would have differed had he been given pre-trial notice of

-14-

Turner's purity testimony. The district court denied Defendant's motion for mistrial, explaining that a defense based on the similarities between the packaging of the heroin seized in Wallace's room on March 10 and the packaging of the heroin seized from Herrara almost two weeks later was utterly without merit.

We review for abuse of discretion a district court's decision on how to remedy a delayed disclosure of evidence. United States v. Mooney, 315 F.3d 54, 64 (1st Cir. 2002). To establish an abuse of discretion sufficient to require reversal, a defendant must make some showing of prejudice. See, e.g., United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1993) (explaining that, in cases of delayed disclosure, a court's principal concern must be whether, given timely disclosure, "a more effective strategy would likely have resulted").

Here, at trial, the district court decided that, once Turner's testimony about purity was heard by the jury, the better course was to say nothing more about it, as any attempt to strike the testimony would only serve to emphasize the testimony. Addressing Defendant's concerns about how the government might use the testimony, the court had the government state for the record (outside the jury's presence) that purity-related issues would not be argued to the jury. At the conclusion of Turner's testimony, the district court indicated that Defendant would be heard if he wished to recall Turner. Although the district court declined to

give Defendant an entire afternoon to consider such a recall, the district court did allow Defendant a recess of one hour and twenty minutes to consult with his toxicologist. At the conclusion of the recess, Defendant neither asked for more time nor complained that he had had insufficient time to confer with his toxicologist. He simply said that he was not prepared to call Turner. Given the circumstances, it would be difficult to find an abuse of discretion on the part of the district court.

We need not definitively decide that question, however. The dispositive consideration is that Defendant has not demonstrated that he was prejudiced by Turner's purity testimony. In his appellate brief, Defendant suggests that the jury's verdict was driven by Turner's purity testimony.[3] The record, however, belies any such suggestion. Consistent with its assurances to the district court, the government did not argue to the jury that the source of the heroin found in Wallace's room could be established by the drug's purity. The government also did not point to the heroin's purity to prove that heroin was the cause of Wallace's

---

[3] In his brief, Defendant states:

There were two different sources of heroin in this case and there was a marked difference in purity, 80% versus 37%. The inference that the government wanted drawn (and which ultimately was drawn) was that although the packaging from the two alleged sources looked the same, the heroin inside the packages was of different purity and therefore different sources.

Defendant's Br. at 10-11.

death.  Instead, to prove the cause of death, the government relied largely on the testimony of the medical examiner, who concluded—without mentioning the matter of purity—that heroin was the likely cause of death.  The medical examiner explained that he based his conclusion upon the totality of the evidence examined, including the presence of heroin in Wallace's room, the drug paraphernalia found next to his body, the foam cone seen on his mouth by the officers at the scene, and the various physical manifestations revealed through toxicological tests and an autopsy.  To establish the source of that heroin, the government relied on the overwhelming evidence that Wallace was found with baggies of heroin that could be traced to Flynn, from Flynn to Tracy, and from Tracy to Defendant.  Given the evidence and the government's arguments, it is anything but apparent that the jury's verdict was influenced, much less driven, by Turner's testimony about the comparative purity of the heroin found with Wallace the night he died and the heroin found with Herrara roughly two weeks later.

Furthermore, before she testified about purity, Turner explained that, unlike the heroin found with Wallace, the heroin found with Herrara was "cut" with lactose.  According to Turner, the lactose was used as a "diluent" to "bulk up the heroin."  Trial Tr. vol. 10, pt. 1, 73-74 (May 9, 2005).  Defendant did not object to the testimony about the lactose found in Herrara's heroin, and the jury was free to consider such testimony whether or not the

-17-

district court granted Defendant's motion to strike Turner's testimony about purity. Under the circumstances, it is difficult to imagine how the district court's failure to strike what, in essence, amounted to cumulative testimony could have prejudiced Defendant.

C.

Defendant next contends that the district court abused its discretion when it allowed the government's medical examiner to give an expert opinion regarding the cause of Wallace's death based on toxicological and autopsy reports that were not prepared by the examiner. Relying on Crawford v. Washington, 541 U.S. 36 (2004), Defendant maintains that he was denied his right of cross-examination. Id. at 42 (holding that the Confrontation Clause prohibits the admission of out-of-court statements that are testimonial in nature unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant concerning the statements).

Dr. Thomas A. Andrew, M.D. ("Dr. Andrew"), Chief Medical Examiner for the State of New Hampshire, testified as an expert regarding the cause of Wallace's death. Dr. Andrew did not himself perform the autopsy on Wallace's body or conduct any toxicological tests or investigate at the scene where Wallace's body was found. In forming his opinion as to the cause of death, Dr. Andrew instead relied on police reports, crime scene photographs, and autopsy and

toxicology reports, all of which were prepared by other individuals. Dr. Andrew explained that such materials are routinely relied on by experts in his field. Dr. Andrew also explained that autopsies are required by law in cases involving sudden, unexpected, or violent deaths, that autopsy reports contain objective fact-only descriptions of the observations made by the examining physician at the time of the autopsy, and that autopsy reports are intended to provide a permanent record of findings relevant to the cause of death.

Defendant objected to Dr. Andrew's testimony on Confrontation Clause grounds. Citing Crawford, Defendant argued that the autopsy report upon which Dr. Andrew relied constituted testimonial evidence prepared by someone whom Defendant could not cross-examine. The district court overruled Defendant's objection at trial, holding that Dr. Andrew's testimony was not based on testimonial hearsay but was, instead, properly based on his review of a record, the preparation of which was required by law. For the same reasons, the district court on remand found that Defendant's Crawford argument did not entitle him to a new trial.

We review de novo a claim that evidence has been admitted in violation of the Confrontation Clause. United States v. Walter, 434 F.3d 30, 33 (1st Cir. 2006); United States v. Brito, 427 F.3d 53, 59 (1st Cir. 2005).

In his appellate brief, Defendant's discussion of his

-19-

Confrontation Clause claim is perfunctory at best.[4]  In essence, he argues that "[b]y allowing the medical examiner to testify concerning reports which he had no part in testing or producing, the defendant was denied his right of confrontation."  Defendant's Br. at 13.  Other than citing Crawford for the general proposition that the introduction of testimonial hearsay runs afoul of the Confrontation Clause, Defendant cites no cases to support his argument.  We reject Defendant's argument, in part because his claim is "unaccompanied by some effort at developed argumentation." Casas, 425 F.3d at 30 n.2.

In addition, we reject Defendant's argument on the merits.  An autopsy report is made in the ordinary course of business by a medical examiner who is required by law to memorialize what he or she saw and did during an autopsy.  An autopsy report thus involves, in principal part, a careful and contemporaneous reporting of a series of steps taken and facts found by a medical examiner during an autopsy.  Such a report is, we conclude, in the nature of a business record, and business records are expressly excluded from the reach of Crawford.  See Crawford, 541 U.S. at 56 (noting that business records are not

---

[4]  See Torres-Arroyo v. Rullan, 436 F.3d 1, 7 (1st Cir. 2006) (noting that "[g]auzy generalizations are manifestly insufficient to preserve an issue for appellate review"); United States v. Casas, 425 F.3d 23, 30 n.2 (1st Cir. 2005)(noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (internal quotation marks and citation omitted).

testimonial by nature); see also id. at 76 (Rehnquist, C.J., concurring) (praising the Court's exclusion of business records from the definition of testimonial evidence falling within the ambit of the Confrontation Clause); United States v. Feliz, 467 F.3d 227, 236-37 (2d Cir. 2006) (noting that autopsy reports are kept in the course of a regularly conducted business activity and are nontestimonial under Crawford); Manocchio v. Moran, 919 F.2d 770, 778 (1st Cir. 1990) (recognizing that autopsy reports are business records akin to medical records, prepared routinely and contemporaneously according to "statutorily regularized procedures and established medical standards" and "in a laboratory environment by trained individuals with specialized qualifications").

In People v. Durio, 794 N.Y.S.2d 863 (N.Y. Sup. Ct. 2005), the court held that the admission of both the routine findings recited in an autopsy report as well as the accompanying testimony of an assistant medical examiner who neither conducted the autopsy nor prepared the report was proper under Crawford. Concluding that the autopsy report was a nontestimonial business record, the Durio court described the practical implications that would follow from treating autopsy reports as inadmissible testimonial hearsay under Crawford:

> Years may pass between the performance of the autopsy and the apprehension of the perpetrator. This passage of time can easily lead to the unavailability of the examiner who prepared the autopsy report. Moreover, medical examiners who regularly perform

-21-

> hundreds of autopsies are unlikely to have any independent recollection of the autopsy at issue in a particular case and in testifying invariably rely entirely on the autopsy report. Unlike other forensic tests, an autopsy cannot be replicated by another pathologist. Certainly it would be against society's interests to permit the unavailability of the medical examiner who prepared the report to preclude the prosecution of a homicide case.

Id. at 869.

Like the court in Durio, we are unpersuaded that a medical examiner is precluded under Crawford from either (1) testifying about the facts contained in an autopsy report prepared by another, or (2) expressing an opinion about the cause of death based on factual reports—particularly an autopsy report—prepared by another.[5] Because, in this case, we find that Dr. Andrew's testimony was proper under Crawford, we find no error in the district court's decisions (at trial and on remand) regarding Dr. Andrew's opinion as to the cause of Wallace's death.

D.

Defendant argues that the district court on remand abused its discretion when it denied his motion for new trial based on

---

[5] We add that, as a matter of expert opinion testimony, a physician's reliance on reports prepared by other medical professionals is "plainly justified in light of the custom and practice of the medical profession. Doctors routinely rely on observations reported by other doctors, and it is unrealistic to expect a physician, as a condition precedent to offering opinion testimony . . . , to have performed every test, procedure, and examination himself." Crowe v. Marchand, 506 F.3d 13, 17-18 (1st Cir. 2007) (internal citations omitted).

-22-

newly discovered evidence.  That evidence, a post-conviction letter written by cooperating witness Elison Anziani to a fellow inmate, purportedly shows that Anziani lied when he testified against Defendant at trial.  Defendant first submitted the letter, in Spanish, to the district court when he filed his post-sentencing memorandum in support of his motion for new trial.  The government submitted an English translation of the letter when the case was returned to the district court on remand.

To obtain a new trial based on newly discovered evidence, a defendant must show that:

> (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) [the evidence] will probably result in an acquittal upon retrial of the defendant.

United States v. Rodriquez-Marrero, 390 F.3d 1, 14 (1st Cir. 2004) (quoting United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980)).  A motion for new trial must be denied if the defendant fails to meet any one of these four factors.  United States v. Gonzalez-Gonzalez, 258 F.3d 16, 20 (1st Cir. 2001).  "For newly discovered evidence to warrant a retrial in a criminal case, the existence of the required probability of reversal must be gauged by an objectively reasonable appraisal of the record as a whole, not on the basis of wishful thinking, rank conjecture, or unsupportable surmise."  United States v. George, 448 F.3d 96, 101 (1st Cir.

-23-

2006) (quoting United States v. Natanel, 938 F.2d 302, 314 (1st Cir. 1991)). We review a district court's denial of a motion for a new trial for manifest abuse of discretion. United States v. Colon-Munoz, 318 F.3d 348, 357 (1st Cir. 2003).

While explaining that it was unable to decipher the true meaning of Anziani's "rambling, incomprehensible, and ambiguous" letter, the district court denied Defendant's motion for new trial based on newly discovered evidence, finding that Defendant failed to satisfy the third and fourth prongs of the Wright newly-discovered-evidence test. According to the district court, Defendant failed to demonstrate either that the evidence contained within the letter was material or that the evidence—if presented upon retrial—would probably result in an acquittal. As noted by the district court, the government well established through witnesses other than Anziani that Defendant conspired to distribute and did, in fact, distribute heroin, that he sold heroin to Alison Tracy on March 8, 2001, and that the heroin he sold to Tracy on March 8 was distributed to Wallace through Flynn, resulting in Wallace's death on March 10.

Like the district court, we find that Defendant has utterly failed to demonstrate that he is entitled to a new trial based on Anziani's post-conviction letter. While Defendant characterizes the letter as an admission by Anziani that Anziani lied during trial, that characterization is questionable to say the

-24-

least.  In fact, as suggested by the government, Anziani seems to be saying in his letter that he did *not* lie.  To be sure, he states that if the records, or "papers" where "it [wa]s written down," failed to support his calculations as to drug quantities (40-50 grams a week) and times (12 weeks in 1999 and 18 weeks in 2001), then perhaps it could be said that he "lied."  Anziani goes on to state, however:

> Those were the things that I stated at trial.  Now, if it wasn't that way, then I'm crazy.  Look, in this thing, it's not about me taking off of me and putting it on the other because I haven't taken off of anyone nor I've taken off of me.  The one that is guilty of everything is Luis himself. . . . Look, Luis didn't lose the trial because of me, he lost because he was guilty.

Government's Suppl. Resp., Addendum at 15.

Even assuming, for the sake of argument, that Defendant's characterization of Anziani's letter as an admission of "fabricated" testimony is accurate, Defendant has neither specified what testimony Anziani recanted nor explained how Anziani's purported recantation would affect a retrial.  It is Defendant's burden to demonstrate every one of the four Wright factors, and such burden he has failed to meet.

Furthermore, even if the "papers" showed that Anziani's testimony was not precisely accurate, it is clear that Anziani's letter in no way exculpated Defendant.  At most, Anziani appears to admit that his testimony, based on his remembrance of particulars,

-25-

might be at odds with the written records. Such admission, however, amounts to impeachment evidence cumulative to the extensive testimony provided on cross-examination regarding Anziani's plea agreement, his recollection of events, and his motivations for testifying. It does not provide a basis for new trial. Wright, 625 F.2d at 1019 (stating that new evidence must be "not merely cumulative or impeaching").

Perhaps most importantly, the record convinces us that the government's case against Defendant was so strong that even if the jury discredited Anziani's testimony in its entirety, Defendant would still have been convicted. The district court thus correctly found that Defendant's newly discovered evidence did not warrant a new trial.

E.

Defendant contends that the district court erred by failing to instruct the jury on the issue of foreseeability. Specifically, Defendant maintains that the jury should have been instructed that it had to find that Wallace's death and the distribution of the charged drug quantities were foreseeable to Defendant. The district court on remand found no merit to this claim, finding that foreseeability is not an element of the jury's findings on either drug quantity or death resulting.

We review de novo a claim that the district court's instructions omitted a required element of the charged offense.

-26-

United States v. Woodward, 149 F.3d 46, 68-69 (1st Cir. 1998).

Count One of the second superseding indictment charged Defendant with conspiring to distribute or to possess with the intent to distribute one kilogram or more of a substance containing heroin. The district court instructed the jury that, in order to find Defendant guilty of Count One, it had to find, beyond a reasonable doubt, that the charged conspiracy existed, that Defendant knowingly participated in that conspiracy, and that the conspiracy as a whole involved one kilogram or more of a substance containing heroin. The district court refused to instruct the jury that it also had to find, beyond a reasonable doubt, that the charged drug quantities were attributable to, or foreseen by, Defendant. Such refusal, we conclude, was not erroneous. See United States v. González-Vélez, 466 F.3d 27, 35-36 (1st Cir. 2006) (upholding the district court's instructions and verdict form in a drug conspiracy case where the jury was instructed to find the amount of drugs involved in the conspiracy as a whole, not the individualized quantity attributable to or foreseen by a particular defendant).[6]

In González-Vélez, the jury was instructed that, to find a defendant guilty of a conspiracy to distribute a controlled substance, it must find, beyond a reasonable doubt: "First that the

---

[6] Because the defendants in González-Vélez failed to object to the jury instructions at trial, the court reviewed the instructions for plain error. The verdict form was reviewed de novo.

agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to distribute controlled substances; and Second, that the defendants knowingly and willfully joined in that agreement." González-Vélez, 466 F.3d at 33. On the verdict form, after each defendant's culpability was determined individually given the above instruction, the jury was asked to find the conspiracy-wide drug quantity, a finding needed for sentencing purposes.[7] On appeal, the defendants argued that the jury instructions and verdict form should have required the jury to make individualized findings as to the amount of drugs attributable to each defendant. This court rejected the defendants' argument, explaining that (1) the quantity of drugs is not an element of a section 846 conspiracy; (2) the drug quantity for the conspiracy as a whole is the relevant drug quantity for purposes of establishing the maximum statutory penalty available to the district court at sentencing for a defendant convicted of a section 846 conspiracy; and (3) an individualized finding by the jury as to the amount of drugs attributable to, or foreseen by, a specific defendant is not required. This court thus upheld the district court's instructions and verdict form against the defendants' claim of error.

---

[7] See United States v. Irizarry, 404 F.3d 497, 504 (1st Cir. 2005) (explaining that, in a drug conspiracy case, the jury sets the maximum penalty available to the district court at sentencing by determining the amount of drugs attributable to the conspiracy as a whole).

Here, consistent with the lessons taught in González-Vélez, the jury was correctly instructed that it should determine, beyond a reasonable doubt, whether the conspiracy involved one kilogram or more of a substance containing heroin. The jury in fact found that the conspiracy involved one kilogram or more of heroin, and that finding triggered a statutory maximum sentence of life in prison, a maximum that was not exceeded by the district court at Defendant's sentencing. Defendant's claim of error—that the jury should have been instructed to make an individualized finding as to the drug amounts attributable to or foreseeable by Defendant—is without merit.

In Counts One and Two of the second superseding indictment, Defendant was charged with committing offenses that resulted in Wallace's death. As to the death-resulting issue, the district court instructed the jury that it must find, beyond a reasonable doubt, that Wallace ingested heroin, that this heroin was a "but for" cause of Wallace's death, and that this heroin was distributed as part of the conspiracy charged in Count One and passed through Defendant's hands as part of the distribution charged in Count Two. The district court refused to give Defendant's proffered instruction—namely, that "[t]he government must prove beyond a reasonable doubt that the heroin distributed by the conspiracy that caused the death of Bryan Wallace was attributable to or foreseeable by the defendant." Trial Tr. Vol.

-29-

11, Pt. 2, 148 (May 10, 2005).

A defendant convicted of either conspiring to distribute or distributing one or more kilograms of heroin faces an enhanced penalty "if death or serious bodily injury results from the use of such substance." 21 U.S.C. § 841(b)(1)(A). Nothing in the language of the statute suggests that a death must be foreseeable before the enhanced penalty provision applies. Indeed, in United States v. Soler, 275 F.3d 146 (1st Cir. 2002), we concluded that "when a defendant deals drugs and a user of those drugs dies as a result, [the enhanced penalty] applies without any independent proof that the death was a reasonably foreseeable event." Id. at 153. Other courts have similarly concluded that application of the death-resulting enhanced penalty does not require a finding of foreseeability. See, e.g., United States v. Houston, 406 F.3d 1121, 1125 (9th Cir. 2005) (holding that "proximate cause, at least insofar as it requires that the death have been foreseeable, is not a required element" of a death-resulting drug offense); United States v. McIntosh, 236 F.3d 968, 972 (8th Cir. 2001) (holding that the language of section 841(b)(1)(A) is "unambiguous and that giving effect to its plain meaning prohibits us from superimposing upon the statute a foreseeability or proximate cause requirement"); United States v. Patterson, 38 F.3d 139, 145 (4th Cir. 1994) (concluding that "the plain language of § 841(b)(1)(C) [the relevant language of which is identical to the language of §

841(b)(1)(A)] does not require, nor does it indicate, that prior to applying the enhanced sentence, the district court must find that death resulting from the use of a drug distributed by a defendant was a reasonably foreseeable event").

That a defendant had no direct dealings with the decedent does not change the enhancement analysis. In McIntosh, the defendant, Steven McIntosh, pleaded guilty to a charge that he conspired with Lenora "Jean" Cresswell and John McMillan to manufacture methamphetamine. The three shared their methamphetamine with others, including Jean's niece, "Amy" Cresswell. McIntosh was unaware that Jean, Amy, and McMillan provided methamphetamine to Jean's 14-year-old daughter, Jessica. Jessica died after she ingested methamphetamine that Amy shared with her. In sentencing McIntosh, the district court determined that McIntosh was subject to the death-resulting enhancement even though there was no proof that McIntosh either directly furnished Jessica with methamphetamine or knew that she was being supplied with the drug by others. On appeal, the Eighth Circuit rejected McIntosh's argument that application of the death-resulting enhancement was precluded because the government failed to prove that Jessica's death was reasonably foreseeable to him. The Eighth Circuit wrote:

> The enhancement inquiry is not altered merely because McIntosh pleaded guilty to conspiracy to manufacture methamphetamine (rather than to a substantive violation of §

841 itself) nor because Jessica obtained the drug directly from someone other than McIntosh. Section 846 provides that a defendant convicted of conspiracy "shall be subject to the same penalties as those prescribed for the [underlying] offense." In this case, the district court found that McIntosh played a direct part in manufacturing the drug ingested by Jessica. The underlying offense holds those who manufacture a drug strictly liable when death results from the manufactured drug. Accordingly, the district court was not required to find that Jessica's death was reasonably foreseeable to McIntosh before enhancing his sentence. In sum, when a conspiracy defendant plays a direct role in manufacturing or distributing a drug that results in death, Congress's intent under § 846 is clear that the defendant is strictly liable under § 841(b)(1)(A)'s enhancement scheme.

McIntosh, 236 F.3d at 973 (footnote omitted); see also Soler, 275 F.3d at 149, 152 (finding the death-resulting enhancement appropriate even though the defendant had no direct dealings with the decedent).

What is required under the death-enhancing statute is that the government prove cause-in-fact, that is, that the decedent's death was caused in fact by his or her use of drugs that were distributed either by the defendant himself or by others in a conspiracy of which the defendant was a part. Here, the district court properly instructed the jury about the required proof of cause-in-fact, and—following the court's instructions—the jury specifically found that Wallace died as a result of ingesting heroin that was distributed during the course of the charged

-32-

offenses by Defendant to Wallace through Tracy and Flynn. Defendant's claims of error based on the issue of foreseeability are without merit.[8]

F.

Defendant contends that the district court erred when it refused to give his proffered multiple conspiracies instruction.[9] Such an instruction was necessitated, he suggests, because the jury heard evidence regarding not just one but two conspiracies, one headed by Defendant and one headed by Miguel. The district court

---

[8] Defendant complains not only about the district court's failure to instruct the jury on the issue of foreseeability. He also complains about the district court's refusal to allow him to argue foreseeability to the jury and its failure to set aside the jury's verdict on the basis of foreseeability. Having concluded that the district court did not err in refusing to instruct on the issue of foreseeability, we also find that the district court did not err in limiting Defendant's argument and in denying Defendant's motions for judgment of acquittal on the basis of a lack of foreseeability.

[9] Defendant's proffered instruction stated, in relevant part:

When two or more people join together in a conspiracy, each is responsible for the acts of others when those acts are foreseeable to him and acts were in furtherance of that conspiracy. In contrast, when there are separate unlawful agreements to achieve different purposes, there may be multiple conspiracies. In that case, a member of one conspiracy is not responsible for the foreseeable acts of those in another conspiracy, or for acts of others not in furtherance of the conspiracy of which he is a part. . . . If you were to find the government has not proven to you beyond a reasonable doubt that [Defendant] participated in a specific conspiracy to distribute heroin that was consumed by Mr. Wallace, then you must acquit defendant of the offense that concerns distribution of heroin to Mr. Wallace resulting in his death.

-33-

on remand rejected this claim as a basis for new trial.

This court reviews a district court's refusal to give a requested jury instruction of this nature for abuse of discretion. United States v. Lewis, 40 F.3d 1325, 1336 (1st Cir. 2004). "The trial court's failure to give a proffered instruction will not be reversed unless that instruction is (1) substantively correct; (2) was not substantially covered in the charge actually given; and (3) concerned an important point such that the failure to give it seriously undermined the defendant's ability to present a particular defense." United States v. Brandon 17 F.3d 409, 448 (1st Cir. 1994). Under this third requirement, reversal is not required unless a defendant suffers substantial prejudice. See United States v. Tipton, 90 F.3d 861, 883 (4th Cir. 1996) (explaining that failure to give a multiple conspiracies instruction does not constitute reversible error "unless a defendant can show that this caused him substantial prejudice"); Brandon, 17 F.3d at 449 (upholding the district court's refusal to give a multiple conspiracies instruction because the defendant failed to demonstrate sufficient prejudice to warrant a reversal). We should keep in mind that, "[i]n the context of alleged multiple conspiracies, the defendant's main concern is that jurors will be misled into attributing guilt to a particular defendant based on evidence presented against others who were involved in a different and separate conspiratorial scheme." Id. at 450.

Here, with little attempt at developed argument, Defendant suggests that the jury may have been misled into attributing guilt to Defendant based on the evidence of Miguel's separate conspiracy. We are not convinced. The district court in this case emphasized to the jury that Defendant could only be held accountable for the conspiracy charged in the indictment, explicitly stating that "[t]he defendant is not on trial in this case for alleged participation in any conspiracy other than the one charged in the indictment." Trial Tr. vol. 11, Pt. 2, 126 (May 10, 2005). In addition, the jury was instructed that it could not attribute guilt to Defendant based on the acts and statements of others, unless those acts and statements were made by members of, and in furtherance of, the charged conspiracy. Id. at 127. As to the death-resulting issue, the jury was asked to find whether the heroin that caused Wallace's death was distributed as a part of the charged conspiracy. Id. at 128-29. Given the district court's clear and correct instructions in the context of the evidence presented at trial, Defendant falls far short of establishing that the jury may have found him guilty based on the evidence regarding Miguel. Defendant's claim of error thus fails because he has not established prejudice.

G.

Defendant claims that he received ineffective assistance of trial counsel. Specifically, Defendant contends that trial

-35-

counsel was ineffective to the extent he (1) failed to adequately develop evidence on the purity-level differences between the heroin found at Wallace's house on the eve of his death and the heroin seized from Herrara two weeks later; and (2) failed to have Wallace's blood tested for heroin. On remand, the district court considered, but found meritless, Defendant's ineffective assistance of counsel claim. We likewise find no merit to Defendant's ineffective assistance claim.

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Kimmelman v. Morrison, 477 U.S. 365, 374(1986). In order to prevail, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). In other words, a defendant must demonstrate both seriously-deficient performance on the part of his counsel and prejudice resulting therefrom. In this case, Defendant has demonstrated neither.

Although the Supreme Court in Strickland discussed the performance prong of an ineffectiveness claim before the prejudice prong, the Court made clear that "there is no reason for a court

-36-

deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697. As the Court noted: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

Here, even if we were to assume, for the sake of argument, that counsel's performance was deficient, Defendant has made little attempt to establish the prejudice prong of the Strickland test. Indeed, he merely states in conclusory fashion that counsel's failures—failure to challenge the expert's purity testimony and failure to have Wallace's blood tested for heroin—materially prejudiced Defendant. Such conclusory argument falls far short of satisfying Defendant's burden to prove that there exists "a reasonable probability" that, absent his attorney's incompetence, "the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

We are mindful that, in evaluating the prejudice suffered by a defendant as a result of his counsel's alleged deficient performance, we must consider the "totality of the evidence before the judge or jury." Id. A verdict "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696; see also Buehl v.

-37-

Vaughn, 166 F.3d 163, 172 (3d Cir. 1999) (noting that "[i]t is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied"); Reed v. Norris, 195 F.3d 1004, 1006 (8th Cir. 1999) (finding it impossible for the defendant to establish prejudice where the evidence of his guilt was overwhelming); Bieghler v. McBride, 389 F.3d 701, 707 (7th Cir. 2004) (finding no prejudice where overwhelming evidence pointed to the defendant's guilt).

In this case, the evidence was overwhelming that Wallace died as a result of heroin that was distributed by Defendant. The heroin baggies found in Wallace's room on March 10, 2001, were marked with black eagles and blue stars; Tracy testified that, on March 8, 2001, Defendant sold her baggies of heroin marked with black eagles and blue stars; that same day, Tracy sold some of those baggies to Flynn; Flynn testified that, on March 9, 2001, he sold some of those same baggies to Wallace; Wallace's body was found the next day; the medical examiner determined that heroin was the cause of death. The evidence linking Defendant to the heroin ingested by Wallace was thus clear. In contrast, there was no evidence to suggest that, during the relevant time period, anyone other than Defendant sold Tracy heroin baggies marked with blue stars and black eagles. Consequently, even if counsel had not "ship-wrecked" Defendant's theory of defense by his alleged

-38-

deficient performance, we find no reasonable probability that the outcome of the trial would have been different.  Quite simply, we find Defendant's claim of ineffective assistance of counsel utterly without merit.

H.

Defendant's final claim is that the verdicts should have been set aside on the ground that they were against the weight of the evidence.  The district court on remand rejected this claim, finding the evidence to be more than ample for a jury to conclude, beyond a reasonable doubt, that Defendant was guilty of the charged offenses.

We review the sufficiency of the evidence challenges *de novo*, "affirming the conviction if, after viewing all the evidence in the light most favorable to the government and indulging all reasonable inferences in the government's favor, a rational factfinder could conclude that the prosecution proved all elements of the crime beyond a reasonable doubt."  United States v. Garcia-Carrasquillo, 483 F.3d 124, 129-30 (1st Cir. 2007).  We review a district court's denial of a motion for new trial for a manifest abuse of discretion.  United States v. Theodore, 468 F.3d 52, 56 (1st Cir. 2006).

Here, the record amply demonstrates that the jury's verdicts were supported by overwhelming evidence.  We find Defendant's arguments to the contrary utterly without merit.

Furthermore, given the overwhelming evidence of Defendant's guilt, it is axiomatic that the district court did not abuse its discretion in denying Defendant's motion for new trial.

## III.

For the reasons stated above, we AFFIRM the district court's judgment of conviction and denial of motion for new trial.