Charles B. SPLUNGE, Petitioner–
Appellant,

v.

Al C. PARKE, Respondent–Appellee.

No. 96–2509.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1998.

Decided Nov. 4, 1998.

Jerold S. Solovy, Robert T. Markowski, Timothy W. Burns (argued), Jenner & Block, Chicago, IL, for Petitioner-Appellant.

Robert L. Collins (argued), Office of the Attorney General, Indianapolis, IN, for Respondent-Appellee.

Before BAUER, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Kenneth Wallace gave a ride to two strangers and paid the ultimate penalty for this kindness. Charles Splunge and Tara Fox, shopping at a liquor store in April 1986, asked Wallace for a ride to a party; he agreed. Fox got in the front seat and Splunge in the back. When Wallace arrived at the destination Fox gave him, Fox demanded money and shot Wallace twice with Splunge's gun when he resisted. Splunge ejected Wallace (still alive but mortally wounded), took his place in the driver's seat, and drove away. Several witnesses saw these events. Another driver pursued Splunge as he sped away. Unable to negotiate a corner, Splunge crashed into a house. He and Fox ran away on foot; both were captured the next day. Fox pleaded guilty to murder. For his part, Splunge denies knowing that Fox planned to rob or shoot the driver, and he attributes to panic rather than to any felonious plan his decision to flee (with Wallace's car) and leave Wallace to die.

Indiana has tried Splunge repeatedly on a charge of felony murder. In each trial Fox testified that Splunge gave her the gun and that the two planned the robbery. She also

has testified that she planned to use the gun only to scare the victim, and that it went off during a struggle. In August 1986, only four months after the killing, a jury convicted Splunge, and like Fox he was sentenced to 60 years' imprisonment. The judgment was affirmed by the Supreme Court of Indiana, 526 N.E.2d 977 (Ind.1988), but four years later we held that a *Batson* error spoiled the verdict and required a retrial. *Splunge v. Clark*, 960 F.2d 705 (7th Cir.1992). At the first of three trials in 1993, the jury was unable to reach a verdict. The next ended before it began: the judge declared a mistrial because of a problem in jury selection. A third produced a conviction, another 60-year sentence, and another affirmance by the state's highest court. 641 N.E.2d 628 (Ind. 1994). Splunge now asks us to hold that this latest conviction likewise must be upset, and yet another trial held. The district court denied his petition for a writ of habeas corpus. 929 F.Supp. 1137 (N.D.Ind.1996). Because the petition was filed before April 24, 1996, we do not use the amended version of 28 U.S.C. § 2254(d). See *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

According to defense counsel, "[t]his is a case of deliberate, egregious, and repeated prosecutorial abuse." The lead example of the behavior to which Splunge attaches this characterization is a question asked of a police officer who was to testify to a statement Splunge made shortly after his arrest. The prosecutor asked the witness whether Splunge had been informed of his rights, and this ensued:

Q. And did he appear to understand what you were reading to him?

A. The first time; yes.

Q. All right. Did he sign that?

A. Not at that time; no.

Q. Okay. Please, explain to me what happened?

A. At that time, Mr. Splunge . . .

BY MR. SHAW [defense counsel]: Your Honor, we would object to this. If he exercised his Fifth Amendment rights, he had the right to do so, and that cannot be used.

BY MR. D'AMOUR [prosecutor]: Let me clarify, attempt to clarify.

Q. Did Mr. Splunge indicate that he was exercising his Fifth Amendment rights at that point?

A. Yes; at that time he advised me that he did not want to give a statement. He wanted to talk to an attorney.

BY MR. SHAW: Your Honor, that was what I was objecting to, and I would ask that the answer be stricken from the record.

BY THE COURT: Overruled.

Q. Did you subsequently again talk to Mr. Splunge?

A. Yes; my supervisor, Lieutenant Stinson had also came in that evening. Since I was already downtown, I decided to go back and start on my paperwork. And, while I was in the process of doing my paperwork, Lieutenant Stinson advised me that Mr. Splunge had changed his mind. That he now wished to speak to me.

Splunge told the officer that he now wanted to talk. *Miranda* warnings were read again; Splunge waived his rights and gave a statement that was introduced at trial. Splunge told the officer that he was in the car when Fox robbed and shot the driver, and that he drove the car away and left Wallace in the street. Splunge also conceded that the murder weapon was a gun he had possessed for a few weeks, though he denied knowing how it came into Fox's possession and denied knowing that Fox planned to rob their benefactor.

In support of the argument that the prosecutor violated the Constitution, defense counsel cite a few decisions of this circuit for the proposition that silence at arrest may not be used to impeach a claim of innocence at trial. That proposition has a firm footing in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), but just poses the critical question: *was* the prosecutor using post-arrest silence in the forbidden way? Perhaps he was trying to show the jury that Splunge's rights had been honored and that the resulting statement was voluntary. See *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90

L.Ed.2d 636 (1986). Or perhaps he was just trying to place in context the statement Splunge ultimately made. *Doyle* does not reveal whether such references violate the Constitution—but later cases do.

*Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), holds that a prosecutor may inform the jury about the entire sequence of questioning preceding a post-arrest statement, even though the suspect declined to answer some of the queries. Charles, who testified in his own defense, told the jury (in response to the prosecutor's questions) that he was initially silent and "[w]hen I tried to talk to my attorney they wouldn't let me see him and after that he just said to keep quiet." 447 U.S. at 406, 100 S.Ct. 2180. The court of appeals held that this information could be separated from Charles's affirmative statements, and that its introduction was constitutional error. The Supreme Court disagreed, and for a reason applicable to Splunge's case too.

Although *Doyle* and its precursor *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), suggest that the problem with any reference to silence is its "insoluble ambiguity", the Supreme Court jettisoned this justification in *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), and *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), when it held that, so far as the Constitution is concerned, states may impeach testimony on the basis of prior silence—provided that the silence had not been induced by post-arrest *Miranda* warnings. Today's rationale for *Doyle* is that it is unfair to tell a suspect that he is entitled to remain silent and then use that silence as the basis of impeachment at trial. But if the suspect talks to the police, there is no such problem, because "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Charles*, 447 U.S. at 408, 100 S.Ct. 2180. The Supreme Court thought it unnecessary to bifurcate the events into Charles's silence (excluded) and his statements (admitted); the complete sequence helped put the statements in context. Just so with Splunge's initial silence, shortly followed by a statement.

What *Doyle* stands for is that arrest-time silence may not be used to impeach trial-time testimony by asking something like: "If the version of events to which you have just testified is true, why didn't you tell this to the police as soon as you were arrested?" After *Charles* and *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), a jury's knowledge that the suspect initially remained silent is not a problem, when that knowledge is not used to subvert the defense in *Doyle*'s fashion. Miller testified in his own defense, and the prosecutor asked on cross-examination why he hadn't told his story at the time of arrest, maneuvering to set up an adverse inference, but the judge cut off the questioning and the punch line was never delivered. Our court held that the prosecutor violated the Constitution just by asking the question, because the jury learned that the defendant remained silent when arrested. *Miller v. Greer*, 789 F.2d 438 (7th Cir.1986) (en banc). The Supreme Court disagreed, holding that because the judge blocked the prosecutor from arguing an adverse inference, there was no constitutional problem. Just so at Splunge's trial; the prosecutor did not ask the jury to infer from Splunge's initial silence that what he said later is unreliable and did not use "defendant's refusal to talk to police as evidence of guilt", *Savory v. Lane*, 832 F.2d 1011, 1017 (7th Cir.1987). Instead the prosecutor showed the jury that the police scrupulously honored Splunge's rights. *United States v. Higgins*, 75 F.3d 332, 333–34 (7th Cir.1996), says that this is permissible. Although the judge in *Miller* sustained an objection and the judge in Splunge's case overruled one, the contexts are materially different. By sustaining the objection the judge in *Miller* prevented the prosecutor from asking the jury to infer guilt from silence; here the prosecutor never pursued the forbidden inference.

■ Behind Splunge's argument is a belief that a jury's knowledge of a suspect's silence is the same thing as the constitutionally forbidden "comment on" silence. That is not how the Supreme Court understands *Doyle*. The Court's most recent summary of the foundation and scope of *Doyle*'s rule is this:

"[T]he use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." This rule "rests on the 'fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" *Wainwright v. Greenfield*, 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (quoting *South Dakota v. Neville*, 459 U.S. 553, 565, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983)).

*Brecht v. Abrahamson*, 507 U.S. 619, 628, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (brackets in original; internal quotation from *Doyle*, 426 U.S. at 619, 96 S.Ct. 2240). The passage of the trial transcript quoted above demonstrates that Splunge's silence was not used "to impeach an explanation subsequently offered at trial." With *Miller* and *Charles* on the books, "*Hale* and *Doyle* do not forbid all mention at trial of *Miranda* warnings and the defendant's response to them. They establish instead that silence following the receipt of *Miranda* warnings may not be used against a defendant." *Higgins*, 75 F.3d at 333. A description of the events following the arrest was just the prologue to the introduction of Splunge's actual statement—*that statement* was used against him, to be sure, but without any problem under the fourteenth amendment.

Prosecutors who invite the jury's attention to a defendant's silence walk a narrow path from which it is easy to fall. Any hint that the silence is inconsistent with later statements produces the inference forbidden by *Doyle* and imperils the verdict. Unless the defendant tries to persuade the jury that any statement he made was involuntary, why take the risk? Splunge did not argue that the statement had been obtained by improper police tactics; his defense—that he did not know how Fox got the gun, did not expect her to commit a crime, and did not steal Wallace's car—was based on the statement. Having had one conviction thrown out under § 2254, the prosecutor should have been doubly careful the next time. Each new trial reduces the likelihood of an accurate outcome, as memories fade or witnesses die. But though the prosecutor walked up to the brink, he did not fall over.

■ Splunge's second principal argument rests on the confrontation clause of the sixth amendment, applied to the states via the fourteenth. A defendant is entitled to cross-examine witnesses about potential sources of bias. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). One such source is the prospect that the witness will receive a benefit, such as a lower sentence, in exchange for favorable testimony. If Fox had an agreement with the prosecutor to that effect, the defense was entitled to bring it out. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Fox was serving 60 years' imprisonment for her role in the crimes. The prosecutor asked Fox on direct examination whether there was any agreement under which her favorable testimony would lead to a lower sentence (or early consideration for parole). She denied that there was. If Splunge had wanted to use cross-examination to cast doubt on that negative answer, he would have been entitled to considerable latitude to do so. But this was not his theory; neither in the state courts nor here has Splunge argued that he suspects any agreement to reward Fox for her testimony (or any unilateral promise on the prosecutor's part). The question to which the prosecutor objected follows:

Q. Now, you got 60 years?

A. Yes, I do.

Q. That means that you have to serve 30 years before you're released?

A. Yeah. I'll be 51 when I get out.

Q. And the only way you can get out of prison before that 30 years is up is if the Judge modifies your sentence?

A. Yes, if he modifies it, or parole.

Q. And the Judge is not permitted by law to modify your sentence, if the Prosecutor objects to it being modified?

A. I don't know.

At this point the prosecutor objected, and after a colloquy outside the jury's presence the judge told defense counsel to desist from

this line of questioning—but the judge did not instruct the jury to disregard what it had already heard.

At side bar, defense counsel told the judge where he was going: he wanted to inform the jury that Fox could have her sentence reduced if and only if the prosecutor so recommended to the judge. Although the prosecutor had not promised to make such a recommendation, counsel wanted the jury to see that whatever hope for a lower sentence Fox entertained would be dashed if she gave testimony that displeased the prosecutor. That is a legitimate line of cross-examination, one that the defense had a constitutional right to explore, see *Lindh v. Murphy*, 124 F.3d 899 (7th Cir.1997), if it rests on a correct statement of Indiana law. But the trial judge thought that it does not.

Defense counsel sought to show "that [Fox] has a motive to assist the State because her only hope of getting out ... before 2016 is if her sentence is modified, and her sentence can't be modified, unless the Prosecutor agrees to allow it to happen." To this the judge replied: "Okay. But you know and I know, if I understand the law properly, I can't modify a sentence after a year anyway. ... The law says we can modify [a sentence] up to a year [after its imposition], period. It doesn't say if the Prosecutor doesn't object. It says we have the right to modify up to a year." Defense counsel interjected: "After a year, you have the right to modify, with permission of the Prosecutor." The judge replied: "I don't think that statute says that." And there the subject rested. If the judge is right, the entire line of cross-examination was worthless. It could not tend to expose a source of bias and therefore would be outside the rationale of *Giglio*, *Davis*, and *Van Arsdall*.

Splunge's current lawyers, whose experience and dedication no one will question, do not argue that the judge misunderstood state law. The Supreme Court of Indiana did not see a problem either:

> Fox testified specifically that she had received no promises from the State in exchange for her testimony. It is obvious that the State was in no position at this late date to extend a promise of a lesser sentence. The remote possibility that Fox would receive a modification or clemency at this time is highly speculative and in no way reflects any arrangement made by the State to procure Fox's testimony.
>
> In 1986 she had given the police a detailed statement implicating appellant in the crime. It was after giving this statement that she received the maximum sixty (60) year sentence for her participation in the killing of the victim. She certainly did not receive any special consideration because of her statement. It is highly improbable that she would receive any special consideration for taking the witness stand and reiterating what she already had said in 1986.

641 N.E.2d at 633. All of the state judges appear to have overlooked a statute that bears on this subject. I.C. § 35–38–1–17(b) provides that a judge may reduce a sentence after a year with the prosecution's consent.[†] But no one brought this statute to the attention of the state trial or supreme courts, the district court, or this court; reliance on it has been forfeited.

■ What Splunge now argues is not that the proposed cross-examination could have exposed any reason for Fox to slant her testimony in the prosecutor's favor, but that defense counsel is entitled to probe a witness' beliefs whether or not they have any legal (or factual) foundation. In principle, even a fan-

---

† I.C. § 35–38–1–17(b) reads: "If more than three hundred sixty-five (365) days have elapsed since the defendant began serving the sentence and after a hearing at which the convicted person is present, the court may reduce or suspend the sentence, subject to the approval of the prosecuting attorney. The court must give notice of the order to reduce or suspend the sentence under this section to the victim (as defined in IC 35–35–3–1) of the crime for which the defendant is serving the sentence." The trial judge may have been unaware of this section, enacted only in 1985, or may have been thinking of a 1991 amendment to subsection (a) of this statute, which extended from 180 to 365 days the time for a judge to reduce a sentence on his own motion. Examination of subsection (a) in isolation would have led the judge to believe that the prosecutor could not consent to a later reduction. Defense counsel did not cite any portion of I.C. § 35–38–1–17 to the judge during the sidebar conference.

tastic belief could lead a witness to shade the truth; if Fox thought that little green men from Mars would richly reward her for helping out the prosecutor, the jury would be entitled to know, for it would diminish her testimony's force. But the defense had the opportunity to ask whether Fox expected (or thought she could receive) a reward, and Fox testified that she didn't know whether the prosecutor could help her obtain a lower sentence; she had no belief about the subject. At this point the principle that a judge may curtail unproductive and speculative cross-examination came into play. "[T]rial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431. "[M]arginally relevant" is an apt description of the questioning the judge closed down.

■ Once again, the prosecutor's unnecessary tactics brought this case to the brink of constitutional error. Allowing defense counsel a little more leeway could not have hurt, for the reason the Supreme Court of Indiana articulated. Fox has been telling the same story all along. Her testimony at Splunge's fourth trial could not have been colored by a belief that it would earn her a lower sentence, when it was identical to the testimony she gave at the first and second trials. Fox and Splunge both received 60–year sentences, the statutory maximum for felony murder; a discounted sentence, that most basic evidence of an agreement with the prosecutor, is missing. Fox did not receive a sentence reduction after giving favorable testimony in trials 1 and 2, making it unlikely that she would expect to receive a reward after giving testimony in trial 4. All of this readily could have been brought out if defense counsel had been allowed to finish his line of cross-examination. But this also shows why, if any error occurred, it was harmless.

■ On collateral attack, a trial error is harmless unless it "had substantial and injurious effect or influence in determining the

jury's verdict." *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710. See also *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Mistaken curtailment of cross-examination is in the category of trial error. *Lindh,* 124 F.3d at 901; *Yancey v. Gilmore,* 113 F.3d 104, 108 (7th Cir.1997). Let us then ask whether any error had a "substantial and injurious" effect. Recall that Fox said that she thought that a judge could reduce her sentence and that she "didn't know" the circumstances that could lead to such a reduction. The judge did not tell the jury to disregard this testimony. Splunge does not argue that with additional questioning he could have obtained some more favorable statement; he did not make an offer of proof at trial or produce an affidavit from Fox in post-conviction proceedings. Splunge does not suggest that Fox's cross-examination at the previous trials turned up revealing details or beliefs that were kept from this latest jury. Nor did he ask the district court to hold an evidentiary hearing to explore what Fox might have said had the cross-examination continued. That Fox's 60–year sentence is the statutory maximum, and has not been reduced to reward her favorable testimony at earlier trials, makes it unlikely that Fox has any belief that the defense could have exploited. Indeed, we have no reason to think that yet another trial would proceed differently from the most recent one. Any error was harmless.

■ Finally, Splunge expresses displeasure with the prosecutor's closing argument. There was much to be displeased about; the prosecutor did not do the State of Indiana proud. But *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), and *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), hold that misconduct in closing argument violates the Constitution only if the closing argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." 416 U.S. at 643, 94 S.Ct. 1868. *Darden* held that a closing argument substantially worse than the one in this case did not support a writ of habeas corpus, even in a capital prosecution. Only one aspect of the

prosecutor's performance calls for additional comment.

During closing argument defense counsel pointed out what the jury surely observed: that his client had not testified. Counsel added: "He didn't have to testify in this case because he had already told the police what had happened." Viewing this as a springboard, the prosecutor asserted during rebuttal: "Think about the victim. The victim in this case has the right to remain silent, too. And he will for all eternity, thanks to Mr. Splunge. He had rights, too." Splunge contends that this statement violates the holding of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), that the prosecutor may not ask a jury to infer guilt from a defendant's use of the privilege against self-incrimination. This contention has the same problem as the argument based on *Doyle*: a jury's knowledge that the defendant used a constitutional right is not the same thing as a request that a penalty be attached to that use. See *United States v. Robinson*, 485 U.S. 25, 31–33, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988); *Lakeside v. Oregon*, 435 U.S. 333, 338–39, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978); *United States v. Sblendorio*, 830 F.2d 1382, 1391–94 (7th Cir.1987). The jury knew that Splunge had not testified; defense counsel offered an innocuous explanation; the judge instructed the jury that a decision not to testify must not be held against the defendant. See *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). The prosecutor's allusion to the victim's right to remain silent was a plea for sympathy rather than a *Griffin*-barred insinuation that a defendant's failure to testify means that he is hiding something. As an entreaty to emotional rather than reasoned decision, it was altogether inappropriate, but we do not think that it created any real risk that the jury would reprobate the crime rather than determine whether Splunge is a criminal. Similarly, we do not think that the prosecutor's remark that "Is there any evidence it was anything else but a robbery? There is nothing before you to show that it was anything else but the robbery. Please don't speculate." would convey the *Griffin*-barred inference to the jury. A prosecutorial remark that evidence is "unrefuted" might create a *Griffin* problem if only the defendant were in a position to supply the refutation. But in this case the principal testimony came from Fox and the witnesses who saw the commotion in Wallace's car. All of this evidence was consistent with the prosecution's theory that Fox and Splunge planned to rob any driver they could persuade to give them a ride; the prosecutor was entitled to observe that there was no contrary evidence.

AFFIRMED

RIPPLE, Circuit Judge, dissenting.

It is well established in the jurisprudence of this court that an indirect reference to the defendant's silence violates the Fifth Amendment when "1) it was the prosecutor's manifest intention to refer to the defendant's silence, or 2) the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence." *Rodriguez v. Peters*, 63 F.3d 546, 561 (7th Cir.1995) (quoting *United States v. Donovan*, 24 F.3d 908, 916 (7th Cir.), *cert. denied*, 513 U.S. 905, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994)). In dealing with the prosecutor's comments on the defendant's invocation of his Fifth Amendment rights, the Supreme Court of Indiana pointedly said that the prosecutor "was attempting to remind the jury that appellant had not testified." *Splunge v. State*, 641 N.E.2d 628, 630 (Ind.1994). This is a finding of fact by that court to which we owe deference. See *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *United States ex rel. Lee v. Flannigan*, 884 F.2d 945, 954 (7th Cir.1989), *cert. denied*, 497 U.S. 1027, 110 S.Ct. 3277, 111 L.Ed.2d 786 (1990). The alternate prong of the test is also met. The remarks here were clearly of the type that a jury would understand as a comment on the defendant's silence. Moreover, even if we assume that the prosecutor did not violate the strictures of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), in his earlier deliberate eliciting of testimony on the defendant's post-arrest silence, that questioning clearly exacerbated the effect of this later commentary on the right to remain

silent. In a situation in which the state's case relied, as a practical matter, on the testimony of the admitted murderer, Tara Fox, it simply cannot be said that this commentary by the prosecutor did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

Not only was the jury allowed to hear the prosecutor emphasize the defendant's invocation of the right to silence, but the jury was also not permitted to hear the defense's full crossexamination of Tara Fox's motivation for giving testimony that fit the prosecutor's version of the case. The trial court did not allow the defense to probe with sufficient comprehensiveness the possibility that Tara Fox was giving favorable testimony in the hope of securing prosecutorial acquiescence in the reduction of her sentence. The trial court apparently cut off the examination because of its misapprehension of Indiana law. In any event, the crucial point was not whether Indiana permitted reduction of the sentence but whether Fox believed that cooperation with the prosecutor could have assisted her in obtaining an earlier release. For a 21 year-old woman facing a release date when she was 51, this incentive, if it was found to exist, would have weighed heavily in the jury's estimation of her credibility. That credibility was, to put it mildly, the linchpin of the state's case.

Because I believe that the state trial court committed two serious errors of constitutional magnitude that had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 631, 113 S.Ct. 1710 (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239), I respectfully dissent.