The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: December 3, 2025

**No. A-1-CA-41859**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**BEN NOVERTO MARTINEZ,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**T. Glenn Ellington, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Charles J. Gutierrez, Supervising Assistant Solicitor General
Albuquerque, NM

for Appellee

Aarons Law PC
Stephen D. Aarons
Hugh W. Dangler
Santa Fe, NM

for Appellant

**OPINION**

**BACA, Judge.**

{1}     Defendant Ben Martinez appeals his convictions for second-degree murder, contrary to NMSA 1978, Section 30-2-1(B) (1994), and tampering with evidence, contrary to NMSA 1978, Section 30-22-5(A) (2003). On appeal, Defendant argues that (1) the State violated his due process rights by improperly commenting on his pretrial silence; (2) the district court erred in excluding evidence concerning Defendant's truthfulness and honesty under Rule 11-404(A)(2)(a) NMRA and Rule 11-608 NMRA; and (3) the district court erred by prohibiting Defendant from recalling a witness in his case in chief to impeach a State's witness. We agree that the State impermissibly commented on Defendant's right to silence, and we conclude that the State has not carried its burden of proving, under a constitutional harmless error standard, that the error was harmless beyond a reasonable doubt. We therefore reverse Defendant's convictions and remand for a new trial. Because we reverse Defendant's convictions on his first claim of error, we do not address the remaining issues raised in Defendant's appeal.

**BACKGROUND**

{2}     Defendant is accused of murdering his future son-in-law Tom Trujillo (Victim). On the day of the murder, Defendant and Victim spent most of the day at Defendant's residence. When night fell, Defendant and Victim began drinking.

While drinking, they played a drinking game called "quarters."[1] Together they consumed nearly a quart of tequila. Around 10:30 p.m., Felicia Valencia, who is Defendant's daughter and Victim's fiancée, walked next door to Defendant's house from her son's house to take Victim home. When she arrived at Defendant's house, the lights were off and both the front and back screen doors were locked. Assuming that Defendant and Victim had fallen asleep, Victim's fiancée walked back to her son's house and went to bed.

{3}    The next morning around 7:30 a.m., Defendant's brother arrived at Defendant's residence and discovered Victim's body on the living room floor. He also discovered a .22 caliber Ruger revolver (the gun) lying next to Victim's forearm. Defendant's brother called police, who arrived on scene shortly thereafter. The investigation revealed that Victim had been shot three times in his torso, with the gun recovered by Victim's body, and that the gun belonged to Defendant.

{4}    Soon after police arrived at the scene, a deputy asked questions of Defendant. During the questioning, Defendant told police that the gun was his and that he usually kept it in his bedroom. This dialogue is set forth below:

---

[1]"Quarters is a drinking game which involves players bouncing an American quarter or similar-size coin off a table in an attempt to have the quarter land in a certain place, usually into a shot glass (or cup) on that table." *Quarters (game)*, Wikipedia, https://en.wikipedia.org/wiki/Quarters_(game) (last visited Sept. 4, 2025).

Deputy: And that firearm that's in there, have you ever seen that before?

Defendant: Yeah, yeah, it belongs to me.

Deputy: It's your firearm? Where is it usually kept?

Defendant: In my bedroom.

{5} Defendant was taken into custody and transported to the local sheriff's office. During transport, Defendant spontaneously stated that he wanted an attorney before being questioned by detectives.[2] Detectives later brought Defendant to an interrogation room and read Defendant his *Miranda* rights. Defendant invoked his rights, and the interview terminated. Defendant was subsequently charged with first-degree murder, a capital offense, contrary to Section 30-2-1(A)(1), and tampering with evidence, a third-degree felony, contrary to Section 30-22-5.

{6} At trial, Defendant's theory of the case was that police failed to adequately investigate several leads, including the possibility that another individual, Joe Romero, may have committed the murder. Eighteen months before Victim was

[2]Our record does not contain the transporting deputy's lapel video during which Defendant was transported to the sheriff's office. However, in the district court, the State did not contest that Defendant spontaneously stated, during transport, that he wanted an attorney. The State instead argued during the hearing on Defendant's motion to suppress that the statement should be admitted as an excited utterance. Further, the State does not dispute that Defendant was later *Mirandized* by detectives and invoked his right to remain silent.

killed, Romero stabbed Victim three times and Victim's fiancée fifteen times over a dispute about money.

{7} At the trial, the State claimed that it first learned about this theory during opening statements, when defense counsel told the jury that it would hear evidence suggesting that Romero had stolen the gun sometime before the murder. Specifically, during his opening statement defense counsel stated:

> The last time [Romero] spent several hours at [Defendant]'s house, shooting BB guns out back, apparently [Romero] took it upon himself to rummage through [Defendant]'s stuff and stole valuables, including a handgun which [Defendant] had kept hidden for years in the bottom right dresser drawer of his master bedroom.

{8} Near the end of its case in chief, the State called Detective Roy Arndt, as a witness. During its direct examination of Detective Arndt the State asked him about the gun—specifically, about his knowledge of the theft of the gun. The following is the exchange that occurred between the prosecutor and Detective Arndt:

Prosecutor: How did you handle the stolen gun?

Det. Arndt: I was never notified that Defendant's gun was stolen. Last Thursday was the first time that I learned of that information.

During direct examination by his defense attorney, Defendant testified on the same subject as follows:

Attorney: To your knowledge, was your gun taken sometime before the shooting?

Defendant: I have no idea. I think. I never checked in the drawer, you know, at home, so I didn't, you know–

Attorney: So, you didn't know if it was there or not there that night?

Defendant: I have no idea.

{9} During its cross-examination of Defendant on this subject, the State asked Defendant, "When did you tell the police your gun was stolen?" Defense counsel objected and argued that the prosecutor was impermissibly commenting on Defendant's right to remain silent. After a bench conference, the district court overruled the objection and the State resumed its cross-examination as follows:

Prosecutor: When did you tell the police your gun was stolen?

Defendant: I don't remember.

Prosecutor: You never did, did you?

Defendant: I don't know.

Prosecutor: And you did not tell police that your gun was located in a drawer, did you?

Defendant: I don't know.

{10} During closing argument, the State argued, "[D]efendant never tells law enforcement the firearm's in a drawer. That came when this trial started. [D]efendant never told law enforcement the gun was stolen. You heard [Detective Arndt] say that came also when this trial started." As well, the State reminded the jury during its

rebuttal argument that "this [theory about the] gun being stolen didn't come out until last week."

{11} The jury convicted Defendant of second-degree murder, a lesser-included offense of first-degree murder, and tampering with evidence. Defendant filed a motion for a new trial pursuant to Rule 5-614(A) NMRA, which the district court denied. This appeal followed.

**DISCUSSION**

**I.      The State's Comments on Defendant's Right to Silence**

{12} Defendant argues that the State improperly commented on his right to remain silent by emphasizing that he waited until the first day of trial to suggest that the gun was stolen. In response, the State acknowledges during the trial that it highlighted the fact that Defendant did not disclose to police that the gun may have been stolen before trial, but argues that it did so for permissible purposes, namely: (1) to demonstrate that Defendant recently fabricated the notion that the gun had been stolen sometime before the murder; and (2) to rebut Defendant's claim that law enforcement failed to adequately investigate the murder. The State also argues that this Court should decline to address the issue because Defendant invited error.

{13} Unpersuaded, and for the reasons that follow, we conclude that the State's questions and comments impermissibly invited and encouraged the jury to infer guilt based on Defendant's pretrial silence concerning any theft of the gun.

## A.    Standard of Review

**{14}**    Because prosecutorial comment on a defendant's silence "raises substantial questions of constitutional law," our review is de novo. *State v. Gutierrez*, 2007-NMSC-033, ¶ 10, 142 N.M. 1, 162 P.3d 156. "Where a defendant has made a proper objection at trial, the appellate court determines whether the prosecution commented on the defendant's protected silence, and if so, reverses the conviction unless the [s]tate can demonstrate that the error was harmless beyond a reasonable doubt." *State v. DeGraff*, 2006-NMSC-011, ¶ 22, 139 N.M. 211, 131 P.3d 61 (internal quotation marks and citation omitted).

## B.    The State Impermissibly Commented on Defendant's Right to Silence

**{15}**    Our Supreme Court has "recognized that the Fifth Amendment right against self-incrimination, the Due Process Clause, and New Mexico evidentiary rules all limit prosecutorial comment on a defendant's silence." *Id.* ¶ 11; *see State v. McDowell*, 2018-NMSC-008, ¶ 4, 411 P.3d 337 (explaining the rationale behind this prohibition); *State v. Pacheco*, 2007-NMCA-140, ¶ 9, 142 N.M. 773, 170 P.3d 1011 (holding that "the [s]tate is generally prohibited from impeaching a defendant's testimony with evidence of [their] silence after receiving *Miranda* warnings"). This is because it is fundamentally unfair to assure a defendant, with *Miranda* warnings, that their silence will not be used against them, and then argue at trial that a negative inference should be drawn from that silence. *See Doyle v. Ohio*, 426 U.S. 610,

618-19 (1976); *see also Splunge v. Parke*, 160 F.3d 369, 372 (7th Cir. 1998) ("What *Doyle* stands for is that arrest-time silence may not be used to impeach trial-time testimony by asking something like: 'If the version of events to which you have just testified is true, why didn't you tell this to the police as soon as you were arrested?'"). Thus, while prosecutors "may unquestionably endeavor to undermine alibis and other forms of exculpatory testimony by suggesting recent fabrication, they must be circumspect about their approach." *Pacheco*, 2007-NMCA-140, ¶ 17. Indeed, "[p]rosecutors who invite the jury's attention to a defendant's silence walk a narrow path from which it is easy to fall. Any hint that the silence is inconsistent with later statements produces the inference forbidden by *Doyle* and imperils the verdict." *Splunge*, 160 F.3d at 373.

{16}     In determining whether the State improperly commented on Defendant's right to remain silent, we consider "whether the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the [defendant]'s exercise of [their] right to remain silent." *DeGraff*, 2006-NMSC-011, ¶ 8 (internal quotation marks and citation omitted). "We evaluate the statement in context to determine the manifest intention that prompted the remarks as well as the natural and necessary impact upon the jury." *Id.* (internal quotation marks and citation omitted). "Where comments by the prosecutor are

ambiguous, we consider what inference the jury was asked to draw from the defendant's silence and the propriety of that inference." *Id.* ¶ 9.

{17}     As the State views it, since Defendant made voluntary statements to law enforcement about the gun and then posited during opening argument that the gun may have been stolen sometime before the murder, the State "was entitled to rebut that theory and show that it was a recent fabrication by establishing that Defendant omitted that detail from his statements to law enforcement." Similarly, the State suggests that since Defendant attacked the integrity of the criminal investigation, it was entitled to rebut Defendant's theory by explaining that law enforcement did not investigate Romero as a potential suspect because Defendant never told the detective that the gun was stolen.

{18}     We agree with the State generally that it was allowed to cast doubt on Defendant's claims and rebut his theories. However, it is well established that the state may not use a defendant's post-*Miranda* silence to do so. *See Pacheco*, 2007-NMCA-140, ¶ 16 ("[I]n general, offering an explanation at trial for a defendant's conduct does not open the door to impeachment of that defendant by the introduction of evidence of [their] post-*Miranda* silence."); *State v. Garcia*, 1994-NMCA-147, ¶ 16, 118 N.M. 773, 887 P.2d 767 (rejecting the state's argument that the defendant opened the door to a subject by asserting an alibi defense during opening statement because the argument "would completely undercut *Doyle*").

{19}     Here, the State's questions and comments consistently drew attention to the fact that Defendant waited until trial to claim that his gun had been stolen. In doing so, the State asked the jury to infer guilt based on what Defendant *did not* tell police. Moreover, the State did not isolate questions about the trial defense to Defendant's pre-*Miranda* interactions with law enforcement. Instead, the State's questions and comments were so broad that they encompassed not just Defendant's voluntary statement but also the entire time period before trial, including the period of time after Defendant asserted his *Miranda* rights. This case is therefore significantly different from the precedents on which the State relies, in which the prosecution impeached the defendants' trial statements with voluntary statements that the defendants did make, rather than the defendants' silence. *See Pacheco*, 2007-NMCA-140, ¶ 10 (explaining that, because the defendant gave a voluntary statement to investigators before invoking his *Miranda* rights, "the prosecutor was permitted to question [the d]efendant freely about the interview, and to engage in a critical comparison of [the d]efendant's prior statement with his trial testimony"); *State v. Loera*, 1996-NMSC-074, ¶ 8, 122 N.M. 641, 930 P.2d 176 (holding that "it was not improper to ask the detective questions about the story [the defendant] had previously told police," because the defendant "waived his right to and did not remain silent either before or during trial").

{20} The dialogue during Defendant's testimony is most telling. Recall that, in initially speaking to the responding officers, Defendant did not state that his gun had been stolen, only that it was his and that he kept it in his bedroom. Then, during direct examination, Defendant again did not testify that his gun had been stolen. Instead, he testified that he "ha[d] no idea" whether his gun had been taken sometime before the shooting, and that he did not know whether the gun was in the nightstand drawer on the night of the murder. Thus, given that Defendant did not testify at trial that the gun was stolen and did not, in his brief pre-*Miranda* statements, state exactly where the gun had been stored, it appears there were no apparent inconsistencies in Defendant's statements with which to impeach him. Accordingly, we are hard-pressed to conclude that the State's line of questioning falls within the permissible scenario outlined in *Pacheco*, namely: "to engage in a critical comparison of Defendant's prior statement with his trial testimony." *See Pacheco*, 2007-NMCA-140, ¶ 10; *see also Doyle*, 426 U.S. at 619 n.11 ("It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to [their] behavior following arrest.").

{21} Lastly, we reject the State's argument that Defendant invited error. Specifically, the State argues Defendant invited error because "[i]t was Defendant, not the State, [who] first elicited direct evidence that Defendant did not tell law enforcement that [Romero] stole [the gun] from his dresser when he spoke to law enforcement" during cross-examination of Detective Arndt. However, the trial transcript confirms—and the State acknowledges—that the State was the first party to elicit testimony about the stolen gun during its direct examination of Detective Arndt.

{22} In short, since Defendant made voluntary, pre-*Miranda* statements about the gun to law enforcement, the State was permitted to compare Defendant's voluntary statements against his trial testimony. *See Pacheco*, 2007-NMCA-140, ¶ 10. Similarly, the State was certainly permitted to cast doubt upon the likelihood of Defendant's claims that law enforcement conducted an inadequate investigation and that the gun may have been stolen sometime before the murder. However, in this case, the State exceeded the scope of permissible inquiry in challenging Defendant's claims. Here, by emphasizing that Defendant's theory about the gun being stolen "didn't come out until last week" when the trial started, the prosecutor was "unmistakably implying that if there was any truth to Defendant's assertion about" the theft of the gun, Defendant "would have saved himself the trouble and anxiety of trial by contacting the police to supply them with the additional, exculpatory

information prior to trial." *See id.* ¶ 14. This is exactly the sort of implication that *Doyle* seeks to safeguard against. *See Garcia*, 1994-NMCA-147, ¶ 16 ("The essence of *Doyle* is that it is fundamentally unfair to assure a suspect that silence will carry no penalty and then, when the suspect offers an explanation at trial, suggest to the jury that anyone with that explanation would naturally have offered it at the time of arrest."); *State v. Lobato-Rodriguez*, 2024-NMSC-014, ¶ 25, 548 P.3d 21 ("[I]f [a] defendant testifies at trial, a prosecutor's comment on a defendant's pretrial silence may impermissibly imply that the defendant fabricated a false but exculpatory version of events during the pretrial silence"). Therefore, "[o]n the facts of this case, we conclude the [State] invited the jury to infer guilt from silence," *see DeGraff*, 2006-NMSC-011, ¶ 9, thereby impermissibly commenting on Defendant's right to silence. *See Pacheco*, 2007-NMCA-140, ¶ 14 (concluding that the state impermissibly commented on the defendant's right to remain silent by implying that the defendant would have contacted police prior to trial if there were any truth to his version of events); *DeGraff*, 2006-NMSC-011, ¶¶ 5, 10 (holding that a prosecutor improperly commented on a defendant's right to remain silent when the prosecutor stated during closing argument that the defendant's explanation of self-defense was not credible because "he did not volunteer it sooner"); *see also United States v. Kee*, 129 F.4th 1249, 1252 (10th Cir. 2025) (concluding that "[i]t would be hard to find a more clear-cut violation of the standard laid out in *Doyle*" than where the prosecution

cross-examined the defendant and emphasized during closing argument that he had not spoken about his side of the story until trial); *Teague v. State*, 891 N.E.2d 1121, 1124, 1126 (Ind. Ct. App. 2008) (holding that the state committed a *Doyle* violation by cross-examining a defendant on whether he had told police before trial that he had any knowledge of the handgun at issue).

**{23}** Although we conclude that the State's questions, comments, and arguments in this case were improper and violated Defendant's right to due process, "we nevertheless must determine the proper remedy for that violation through the lens of harmless error review." *Lobato-Rodriguez*, 2024-NMSC-014, ¶ 20; *see Gutierrez*, 2007-NMSC-033, ¶ 19 (explaining that our Supreme Court "decline[d] to adopt a rule of automatic reversal for every prosecutorial comment on silence, . . . Such a rule would represent a sharp departure from strong, existing precedent which requires application of a harmless error standard."). We turn then to consider if the error here was harmless.

## C.    The Error Was Not Harmless

**{24}** The State asserts that the error was harmless because the evidence of Defendant's guilt in this case was overwhelming. We disagree. Under the facts of this case, we conclude that the State failed to establish that the error was harmless beyond a reasonable doubt. We explain.

**{25}** We begin by recognizing that in cases such as this, our Supreme Court has stated, "While the jury verdict is not automatically afforded deference when a constitutional error has infected the trial, neither is the verdict automatically reversed." *Lobato-Rodriguez*, 2024-NMSC-014, ¶ 13 (alterations, omission, internal quotation marks, and citations omitted). Instead, in deciding whether the error was harmless where, as here, a constitutional error has been established, the State must prove that the error was harmless beyond a reasonable doubt. *See State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110; *Gutierrez*, 2007-NMSC-033, ¶ 18. A constitutional error "cannot be deemed harmless if there is a reasonable possibility that the [error] complained of might have contributed to the conviction." *Gutierrez*, 2007-NMSC-033, ¶ 18 (internal quotation marks and citation omitted). Thus, "we examine the error in the context of the trial as a whole." *Lobato-Rodriguez*, 2024-NMSC-014, ¶ 21. In doing so, we consider the relevant circumstances of each case, including "the extent to which the error was emphasized at trial; the role of the error in the prosecution's overall case; and—although it is not dispositive—[the] evidence of a defendant's guilt separate from the error." *Id.* (internal quotation marks and citation omitted). Our Supreme Court has "emphasize[d] that constitutional error cannot be deemed harmless simply because there is overwhelming evidence of the defendant's guilt." *Id.* ¶ 15 (internal quotation marks and citation omitted).

{26} As described at length above, the prosecutor emphasized Defendant's silence in closing and in questioning, and overall, the clear intent of the prosecutor's questions and comments, and their natural impact on the jury, was to directly impeach Defendant's theory of the case with his pretrial silence. Defendant's credibility in this case was critical since he testified at trial, and denial was his only realistic defense. Along the same lines, impugning Defendant's credibility was the only realistic response that the State had to address his defense. The State and Defendant relied on essentially the same evidence to prove their theories: Victim and Defendant were in the locked house together and the gun that shot Victim belonged to Defendant.

{27} The State was in a difficult position to negate Defendant's theory with evidence, because there were no witnesses to the murder, no individuals who heard gunshots, and the jury was confronted with conflicting testimony about what happened that evening. Although the jury heard evidence that Defendant's DNA was found on the cylinder of the gun, it was undisputed that the gun belonged to Defendant, and Detective Arndt testified that it was "probable" that Defendant's DNA would be found on his own gun. Similarly, while the jury heard evidence that no fingerprints were recovered from the gun, a forensic expert testified that there is never a guarantee that fingerprints can be recovered from a surface, and that latent fingerprints are "fragile" and could be removed simply by handling an item. We note

that the jury viewed lapel footage showing a deputy picking up the gun and moving it to a nearby table when police first arrived on the scene. Despite the conflicting evidence, to the State, the evidence was "simple math," because the evidence showed "two people in that house, one ended up dead." To encourage the jury to reject Defendant's theory that another person was in the house, the State argued that Victim was too drunk to have had the encounter with a third person that Defendant posited and reminded the jury that Defendant's theory was never mentioned by anyone before trial.

{28}    Likewise, while the State presented circumstantial evidence, which could allow the jury to reasonably infer Defendant's guilt, it is also reasonably possible that absent the constitutionally forbidden comments, at least one juror might have voted to acquit Defendant.

{29}    For these reasons, we must conclude that there is a reasonable possibility that the State's impermissible comment on Defendant's silence impacted the jury's verdict. The error was therefore not harmless and requires reversal. *See State v. Costillo*, 2020-NMCA-051, ¶ 19, 475 P.3d 803 (stating that "[i]t would be impossible to conclude . . . that the prosecutor's comments on [the d]efendant's silence were insignificant to the jury in its deliberation, particularly given the fact that the evidence of [the d]efendant's guilt otherwise hinged largely on the testimony and credibility of [another witness]"); *Pacheco*, 2007-NMCA-140, ¶ 19 (concluding

that a prosecutor's comments on the defendant's silence constituted fundamental error where the trial outcome "was essentially reduced to resolving the conflicting testimony by determining witness credibility").

## II.    Double Jeopardy Does Not Prohibit Retrial

{30}    Because we reverse Defendant's convictions, we must consider whether retrial of Defendant is barred by double jeopardy. "To avoid violating double jeopardy, retrial is allowed on remand only when the defendant's convictions were supported by substantial evidence." *State v. Chavez*, 2024-NMSC-023, ¶ 39, 562 P.3d 521. Accordingly, we briefly consider whether Defendant's convictions for second-degree murder and tampering with evidence were supported by substantial evidence.

{31}    "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Torres*, 2018-NMSC-013, ¶ 42, 413 P.3d 467 (internal quotation marks and citation omitted). The reviewing court "view[s] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the

evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "Our standard of review for sufficiency of the evidence is highly deferential to the jury's verdict." *Chavez*, 2024-NMSC-023, ¶ 40. "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cunningham*, 2000-NMSC-009, ¶ 26 (alteration, emphasis, internal quotation marks, and citation omitted). "The jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (alterations, internal quotation marks, and citation omitted).

## A. Sufficient Evidence Supports Defendant's Conviction for Second-Degree Murder

{32} To convict Defendant of second-degree murder, the district court instructed the jury that the State had to prove each of the following elements beyond a reasonable doubt:

1. [D]efendant killed [Victim];

2. [D]efendant knew that his acts created a strong probability of death or great bodily harm to [Victim]; or any other human being;

3. This happened in New Mexico on or about June 30, 2018.

{33}  Here, substantial evidence supports Defendant's conviction for second-degree murder. At trial the State presented the following evidence that supports the inference that Defendant killed Victim: (1) Defendant's neighbor testified that he left Defendant's residence at around 10:00 p.m. that evening; (2) Defendant testified that after the neighbor left the residence, Defendant and Victim were the only individuals in the house; (3) Victim was shot with Defendant's gun; (4) Defendant testified that he did not hear anyone come into his house that evening; and (5) there were no signs of forced entry into Defendant's home. This evidence was sufficient for any rational jury to conclude beyond a reasonable doubt that Defendant killed Victim.

{34}  Additionally, as to the second element, the State presented evidence that Victim was shot three times, at least two shots happened at close range, and the forensic pathologist testified that any one of the three gunshot wounds could have been fatal. It is reasonable for a jury to conclude that an individual who shoots someone three times knows that his actions create a strong probability of death or great bodily harm to another. Therefore, sufficient evidence supports the conclusion that Defendant knew that his acts created a strong probability of death or great bodily harm to Victim.

**B. Sufficient Evidence Supports Defendant's Conviction for Tampering with Evidence**

{35} To convict Defendant of tampering with evidence, as charged in the criminal information, the district court instructed the jury that the State had to prove each of the following elements beyond a reasonable doubt:

    1.    [D]efendant changed and/or placed the firearm;

    2.    By doing so, [D]efendant intended to prevent the apprehension, prosecution, or conviction of himself for the crime of [m]urder;

    3.    This happened in New Mexico on or about June 30, 2018.

{36} "Because tampering with evidence is a specific intent crime, conviction requires that the [s]tate present sufficient evidence to allow a jury to infer both an overt act and the defendant's subjective, specific intent." *State v. Sanchez*, 2015-NMCA-077, ¶ 17, 355 P.3d 51.

{37} Here, the State alleged that the gun had been "wiped off" sometime after the shooting and placed next to the Victim. During opening statements, Defendant conceded that the firearm had been cleaned, stating, "one thing both sides agree on . . . , the gun was wiped and dropped at the scene." Thus, the issues before the jury were (1) whether Defendant was the individual who cleaned the gun; and (2) if so, whether Defendant acted with intent to prevent the apprehension, prosecution, or conviction of himself for the crime of murder.

{38}    As discussed, the State presented evidence that Defendant and Victim were the only individuals in Defendant's house on the evening of the murder. If the jury believed Defendant was the only other individual in the house, then a reasonable fact-finder could also conclude that Defendant was the individual who cleaned the gun. As to the second element, "[w]hen there is no other evidence of the specific intent of the defendant to disrupt the police investigation, intent is often inferred from an overt act of the defendant." *State v. Duran*, 2006-NMSC-035, ¶ 14, 140 N.M. 94, 140 P.3d 515. A reasonable fact-finder could infer that the overt act of cleaning the gun and placing it next to the body was done by Defendant with the intent to prevent the apprehension, prosecution, or conviction of himself for the crime of murder.

{39}    Having found that substantial evidence supports Defendant's convictions for second-degree murder and tampering with evidence, we conclude that double jeopardy does not prohibit retrial of Defendant on those charges.

**CONCLUSION**

{40}    We hold that the State impermissibly commented on Defendant's right to silence. We, therefore, reverse Defendant's convictions and remand for a new trial.

{41}    **IT IS SO ORDERED.**

_____
**GERALD E. BACA, Judge**

**WE CONCUR:**

_____
**ZACHARY A. IVES, Judge**

_____
**KATHERINE A. WRAY, Judge**